# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| BOARDWALK AND BASEBALL, INC., | Case No. 8:14-bk-00317-MGW |
| COLERIDGE CORPORATION, | Case No. 8:14-bk-00318-MGW |
| BOARDWALK LAND DEVELOPMENT, INC., | Case No. 8:14-bk-00319-MGW |
| | |
| | *Jointly Administered Under* |
| Debtors. | *Case No. 8:14-bk-317-MGW* |

_____/

**JOINT MOTION FOR AUTHORITY TO (I) SELL ASSETS OUTSIDE
OF THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES, (II) ESTABLISH SALE PROCEDURES,
(III) SET A HEARING DATE ON SALE, (IV) APPROVE FORM OF NOTICE AND
SHORTENED NOTICE IN CONNECTION WITH CONSENSUAL PLAN OF
REORGANIZATION AND (V) APPROVE AND CODIFY SETTLEMENT TERMS**

**BOARDWALK AND BASEBALL, INC., COLERIDGE CORPORATION, BOARDWALK LAND DEVELOPMENT, INC.** (collectively, the "**Debtors**"), **CITY CENTER COMMUNITY DEVELOPMENT DISTRICT**, a local unit of special purpose government (the "**District**"), **U.S. BANK NATIONAL ASSOCIATION**, solely as indenture trustee (the "**Indenture Trustee**"), and **CITY CENTER BONDS, LLC**, (the "**Bondholder**")[1] (collectively, the Debtors, the District, the Indenture Trustee and the Bondholder are referred to as the "**Co-Plan Proponents**"), pursuant to §§ 105, 363, 1107, 1108, 1123 and 1146 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 6006, Fed.R.Bankr.P., and in connection with the Consensual Plan of Reorganization (the "**Consensual Plan**"), request the entry of an order by this Court (the "**Bankruptcy Court**") granting this joint motion (the "**Bid Procedures Order**") and approving the following on an expedited basis (the "**Bid Procedures**"):

      (i)      approving a Stalking Horse Bid and the Purchase and Sale Agreement ("**PSA**") attached as Exhibit "**A**" (as defined below);

---

[1] The Bondholder is the owner of 100% of all outstanding 2005A Bonds and 2007A Bonds (as defined below).

    (ii)       approving the Bid Procedures set forth herein (as defined below);

    (iii)     establishing certain hearing dates and time and notice periods relative to the Sale (as defined below) proposed herein;

    (iv)     establishing a date for the Auction (as defined below) of the Property (as defined below), if necessary;

    (v)      approving the form of the Sale Notice (as defined below);

    (vi)     approving and/or ordering any other process or procedure necessary to affect the relief sought herein; and

    (vii)    approving and codifying the binding settlement agreement by and between certain of the Co-Plan Proponents and certain third parties, including but not limited to, Brenda Nestor, individually and the probate estate of Victor Posner (collectively the "**Settlement Parties**").

The Co-Plan Proponents further request the entry by the Bankruptcy Court of a Final Sale Order ("**Final Sale Order**") as follows:

    (i)       approving the Sale to the Successful Bidder (as defined below), free and clear of all interests, pledges, liens, claims and encumbrances except as otherwise provided for herein and in the PSA;

    (ii)      authorizing and compelling all of the Co-Plan Proponents, including the Debtors' Estates and the CRO (as defined below), to take any and all actions necessary to effectuate the Sale;

    (iii)     authorizing and approving the assumption and assignment of executory contracts and leases, if any, pursuant to 11 U.S.C. § 365;

    (iv)     authorizing and approving any further relief necessary to accomplish the Sale including, but not limited to, shortening certain deadlines and notice periods; and

    (v)      confirming the terms of the settlement between the Settlement Parties.

In support of this motion, the Co-Plan Proponents state:

## JURISDICTION, VENUE AND STATUS

1.      On January 13, 2014, the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. [ECF No. 1; ECF No. 1, Case No. 8:14-bk-00317-MGW; and ECF No. 1, Case No. 8:14-bk-00318-MGW].

2.      On January 14, 2014, this Court entered an order finding that the cases should be jointly administered with Case No. 8:14-bk-00317-MGW as the "lead case". [ECF. No. 6].

3.     No trustee or examiner has been appointed.

4.     Soneet Kapila was approved as the Chief Restructuring Officer (the "**CRO**") on an interim basis [ECF Nos. 66 and 67], and he has been running the reorganization efforts on a day to day basis. The Co-Plan Proponents consent to, and shall request the Court to approve, the retention of the CRO by final order.

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

8.     The statutory predicates for the relief requested are 11 U.S.C. §§ 105, 363, 1107, 1108, 1123 and 1146 and Rules 2002, 4001, 6004, 6006 and 9019, Fed.R.Bankr.P.

## BACKGROUND

### A.     The Parties

#### i.     The Debtors

9.     The Debtors are the owners of, or claim an interest in, several parcels of land located in Polk County Florida as set forth in the attached Exhibit "A" (the "**Property**"). The Property is within the District's boundaries. There are substantial infrastructure improvements funded by the proceeds of the Bonds that benefit the Property. There is no vertical construction on the Property.

10.     Prior to 2008, the Debtors were engaged in developing the Property. Since 2008, no material development activity has occurred relative to or on the Property.

#### ii.     The District

11.     On or about January 8, 2003, the Board of County Commissioners of Polk County, Florida adopted Ordinance No. 03-01, which established the District pursuant to the provisions of Chapter 190, Florida Statutes.

Case No. 14-bk-00317-MGW
Case No. 14-bk-00318-MGW
Case No. 14-bk-00319-MGW
*Jointly Administered*

12.     The District is a local unit of special purpose government of the State of Florida; the District is governed by its Board of Supervisors, except to the extent of the powers provided to Gary Moyer, as a receiver, pursuant to two (2) court orders in the Circuit Court Action. The Co-Plan Proponents agree and acknowledge Mr. Moyer's authority to bind the District relative to this motion, the Property, and these bankruptcy cases.

13.     The District's powers are granted by Chapter 190, Florida Statutes, including but not limited to, having the authority to impose Special Assessments on land located within its boundaries.

14.     The District's obligations and rights are governed and controlled by, *inter alia*, Chapter 190, Florida Statutes, the Indenture, and a series of Resolutions entered into between January 2003 and May 2013 as further set forth below.

**B.     The District's Creation and Purpose**

15.     By statute, the District is empowered to finance and construct public improvements and community facilities such as basic infrastructure (water, sewer, bridges, roads, transportation systems, parking improvements, conservation areas, etc.). Fla. Stat. § 190.012. Community development districts typically issue and sell bonds to raise monies to fund the public improvements projects within districts that benefit the property. Fla. Stat. § 190.011(9).

17.     A district is empowered by statute to levy, impose, collect and enforce special assessments and to use the special assessments to, among other things, repay the moneys raised from the sale of bonds and to pay the district's operating expenses. Fla. Stat. § 190.011(14).

18.     The power of a district to levy assessments includes: special assessments to make required payments on the bonds which are issued to finance district facilities and projects ("**Bond Assessments**"), Fla. Stat. § 190.021(2); and "Operation Maintenance Special

Assessments" ("**O&M Assessments**"), which are levied to maintain and preserve the facilities and projects of the district. Fla. Stat. § 190.021(3).

19.    Both Bond Assessments and O&M Assessments, until paid, constitute liens upon the property against which they are assessed until paid, Fla. Stat. § 190.021(2), (3), having a lien priority co-equal to *ad-valorem* real property taxes: Fla. Stat. § 190.021(9).

20.    The District's assessment liens "... may be foreclosed by the District in foreclosure proceedings in the name of the district in a court of competent jurisdiction as provided by general law...." Fla. Stat. § 190.026.

C.    **The District Issues Special Assessment Bonds and Levies Assessments.**

21.    On or about January 30, 2003, the District Board adopted Resolution 2003-18, which authorized the District to issue revenue bonds to finance District projects approved in the Indenture associated with the issuance of such bonds.

22.    On March 24, 2003, the Circuit Court in and for Polk County, Florida entered a Final Judgment (the "**Final Judgment**") validating in all respects the District's issuance of capital improvement revenue bonds and the Indenture.    No appeal was taken within the time prescribed.    The Final Judgment was recorded in Official Records Book 5302, Pages 1292 through 1301, on March 25, 2003.

23.    On or about April 21, 2005, the District Board adopted Resolution 2005-04, which (along with Resolution 2003-18) authorized the District to issue Special Assessment Revenue Bonds, Series 2005A (the "**2005A Bonds**") to finance District projects and approved the Second Supplemental Trust Indenture associated with the issuance of said Bonds (the "**2005 Bond Assessments**")

24.    On or about May 24, 2005, the District Board adopted Resolution 2005-07 which authorized certain capital improvement projects to be constructed by the District.    Resolution 2005-07 further equalized, approved, confirmed and levied special assessments pursuant to

chapter 170, Florida Statutes, to fund the construction of water and wastewater facilities, a surface water management system, bridges, roadways and landscaping, entrance walls and signage, park and recreational facilities, fire prevention and control facilities, and utilities to serve lands within the District.

25.     On or about May 17, 2007, the District Board adopted Resolution 2007-02 which authorized the District to issue Special Assessment Revenue Bonds, Series 2007A (the "**2007A Bonds**") to finance District projects and approved the Third Supplemental Trust Indenture associated with the issuance of such Bonds

26.     On or about May 17, 2007, the District Board adopted Resolution 2007-03 approving the preliminary assessments and calling for a public hearing on the assessments.

27.     On or about June 21, 2007, the District Board adopted Resolution 2007-05. Resolution 2007-05 authorized certain capital improvement projects to be constructed by the District.  In addition, Resolution 2007-05 equalized, approved, confirmed and levied special assessments pursuant to Chapter 170, Florida Statutes, to fund the construction of water and wastewater facilities, a surface water management system, bridges, roadways and landscaping, entrance walls and signage, park and recreational facilities, fire prevention and control facilities, and utilities to serve lands within the District (the "**2007 Bond Assessments**").

28.     These improvements specially benefitted all the property located within the District, including the property owned by the Debtors.

29.     The 2005 Bond Assessments and the 2007 Bond Assessments (collectively, the "**City Center Bond Assessments**") secure repayment of the 2005A Bonds and the 2007A Bonds and, pursuant to Florida Statute §§ 170.09 and 190.021(9), represent liens coequal with the liens of all state, county, district and municipal taxes, superior in dignity to all other liens, titles and claims until paid.

30.     The "Pledged Revenue" for the repayment of the 2005A Bonds and the 2007A Bonds includes the City Center Bond Assessments imposed pursuant to Resolutions 2005-07, 2007-03, and 2007-05.

31.     The 2005A Bonds and the 2007A Bonds were issued by the District under and pursuant to Chapter 190, Florida Statutes, and the Indenture by and between the District and the Trustee. The proceeds from the sale of the 2005A Bonds and the 2007A Bonds provided funds to construct capital improvements within the District for the benefit of all the property therein, including the Property owned by the Debtors.

## E.    The Debtors' Default

32.     This motion and the procedures agreed to herein shall, if approved by the Court as agreed by the Co-Plan Proponents, resolve issues related to pending litigation more described herein and all defaults in existence. The District asserts that all amounts owed to the District by the Debtors have been accelerated and the entire amount of the City Center Bond Assessments is currently due and owing and said amounts are accruing statutory penalties pursuant to Fla. Stat. §§ 170.09 and 170.10. Absent the settlement between the parties, the Debtors would assert the right to de-accelerate the City Center Bond Assessments. The settlement incorporated herein resolves this dispute as to the liability of the Debtors and their affiliates.

33.     On March 31, 2014, the District filed proofs of claim for the City Center Bond Assessments totaling in excess of $50 million (the "**Secured District Bond Claims**"). The proof of claims filed also included (a) secured claims for unpaid O&M Assessments (the "**Secured District O&M Claims**," collectively with the Secured District Bond Claims, the "**Secured District Claims**"), and (b) unsecured claims relating to obligations the Debtors have under various agreements with the District (the "**Unsecured District Claims**," collectively with the Secured District Claims, the "**District Claims**"). As set forth in their Case Management Report,

absent the settlement, the Debtors would dispute the amount of the District Claims. The settlement incorporated herein resolves this dispute.

**F.      The Parties Reach a Settlement**

34.      After significant negotiations and discussions, the Co-Plan Proponents have agreed to submit and support a Consensual Plan. The Consensual Plan shall provide for, *inter alia*, a Sale of the Property (as defined below) through a "363 Auction Process" and shall contain provisions that are consistent with the terms of this motion. It further provides that certain actions (and the claims alleged therein) be dismissed with prejudice and releases issued, including but not limited to, that certain action filed by the Debtors for slander of title in Adversary Proceeding Case No. 14-ap-00127-MGW, which was originally filed in the Circuit Court of the 10th Judicial Circuit in and for Polk County, Florida as Case No. 2013-CA-2653 and recently removed to this Court (the "**Slander of Title Action**"), and including but not limited to those actions listed in Paragraph 69(a) below.

## THE SALE OF ASSETS

**A.      The Property**

35.      This motion requests authority to approve and publish all procedures to effect the Sale to the District and convey title to the Property directly to the "**District Designee**"[2] or a third party purchaser of the Property (the "**Sale**"), including all related personal property which includes all improvements (the "**Improvements**") owned by Debtors and/or located upon the Property, and such Debtors' interest, if any, in and to (i) all strips and gores of land lying adjacent to the Property, lands underlying any adjacent streets or roads, easements, privileges, rights-of-way, riparian and other water rights, and other appurtenances pertaining to or accruing to the benefit of the Property; (ii) all fixtures, currently located on the Property (the "**Personal Property**"); (iii) all licenses, permits, contract rights, entitlements, development rights, and

---

[2] The District Designee shall be and is hereby defined as the Bondholder or the Bondholder's designee.

approvals pertaining to the ownership, operation and/or proposed development of the Property, if any; and (iv) all of Debtors' general intangible rights pertaining to ownership and/or proposed development of the Property. However, specifically excluded from this motion are certain assets which consist of all cash of the Debtors, causes of action arising under chapter 5 of the Bankruptcy Code, the Debtors' interests in Posner Park Retail, LLP, and other assets not specifically set forth herein (the "**Retained Assets**"). For the avoidance of doubt, the Slander of Title Action shall be dismissed with prejudice by the Debtors at the Closing and the Debtors represent that such claim has not been sold, transferred, assigned nor maintained, upon the Closing of the Sale.

36.    As set forth above, the Property is subject to a valid, first priority lien in favor of the District (of equal dignity with *ad valorem* tax assessments and O&M Assessments). The Sale shall reduce the amount of the Secured District Bond Claim by the amount of the purchase price (including the amount of any credit bid) approved by the Final Sale Order. Upon Closing, all District Claims shall be deemed satisfied *vis a vis* the Debtors, their affiliates, and the Retained Assets, subject to the reservations contained herein. The Sale shall not cause a merger of title to the Property in any fashion. If the Property is sold to the District, the Property shall be conveyed to the District's Designee without waiving, and subject to any rights to enforce or cause the enforcement of or the collection of any special assessments and liens not satisfied by the proceeds of the Sale, as well as any and all future installments of the City Center Bond Assessments securing the Bonds, including but not limited to all future principal amounts, interest, penalties or other amounts arising from any future payments due on the City Center Bond Assessments. If the Property is sold to a person or entity other than the District, then the District shall receive the proceeds of Sale to which it is entitled hereunder in satisfaction of the District Claims. THE DISTRICT SHALL PROMPTLY TURN OVER SUCH PROCEEDS TO THE INDENTURE TRUSTEE FOR THE BENEFIT OF THE BONDHOLDER, SUBJECT TO

THE BONDHOLDERS AND DISTRICT ENTERING INTO AN AGREEMENT WHICH PROVIDES FOR THE PAYMENT OF THE COSTS INCURRED BY THE DISTRICT IN CONNECTION WITH THIS MOTION AND THE PAYMENT OF OBLIGATIONS OF THE DISTRICT WHICH HAVE ACCRUED AS OF THE DATE OF TRANSFER OF TITLE. Notwithstanding anything herein to the contrary, upon the closing of the Sale (either to the District Designee or third party Successful Bidder) or other conveyance of the Property to the District Designee in accordance with the Bid Procedures Order, all District Claims shall be deemed satisfied *vis a vis* the Debtors, their affiliates, and the Retained Assets; provided, however, that in the event the District Designee is the Successful Bidder, the Secured District Bond Claims shall not be deemed satisfied *vis a vis* the Property.

**B.    The Stalking Horse Bid**

37.    The District agrees to act as the "stalking horse bidder" and the District has presented to the Debtors the PSA providing for, *inter alia*, a stalking horse bid in the amount of $25 million as a non-cash credit bid to which Cure Costs (as defined below), if any, will be added (the "**Stalking Horse Bid**"). At the Auction, if an Auction is necessary (as defined below), the District shall be entitled to credit bid up to an agreed amount of the District's Secured Claim (the "**Maximum Credit Bid**").[3] If the District is the Successful Bidder, the full amount of any credit bid by the District shall be applied dollar for dollar, toward a reduction of the District Claims. If the District is not the Successful Bidder, then the District and the Debtors shall share the proceeds of the Sale from the Successful Bidder at Closing as set forth on **Schedule 1**, not to exceed the Secured District Claims, including all penalty claims. A Successful Bidder who is not the District must complete a purchase and sale agreement that contains the same terms and conditions as the PSA and is in substantially the same form as the

---

[3] This number is discounted but not disclosed so as to encourage all parties that are ready, willing and able to enter the auction process. The number may be disclosed to the Court in camera and may be shared with the PBGC and other non-bidding creditors under a confidentiality agreement.

PSA attached hereto. All costs of Sale shall be payable as provided in Schedule 1. The Successful Bidder shall be responsible for and/or take subject to the full payment of all current and past due *ad valorem* real estate taxes and the outstanding O&M Assessments due the District by the Debtors, which total approximately $1.2 million.

### C.    <u>Executory Contracts and Unexpired Leases</u>

38.    If the Debtors determine that any executory contracts or unexpired leases exist, then the Debtors shall provide the other Co-Plan Proponents with a list and copies of all executory contracts and unexpired leases relating to the ownership and operation of the Property within five (5) business days of the entry of the Bid Procedures Order.

39.    The District shall advise the Debtors no later than five (5) business days prior to the Auction (as defined below) as to the executory contracts and unexpired leases to be assumed and assigned by the Debtors to the District's Designee, or the Successful Bidder, as well as any such contracts and/or leases to be rejected.

40.    Should any executory contracts or unexpired leases pertaining directly to the Property exist, the District's Designee, or other Successful Bidder, if it so elects, shall satisfy the amounts necessary to cure any payments required to be paid under any such executory contract or unexpired leases up to the amount of $25,000 as a condition precedent to assumption and assignment at Closing (the "**Cure Costs**"); provided, however, the Debtors shall provide to the District, or other Successful Bidder, estoppel letters as to the amount necessary to cure no later than ten (10) days prior to the Auction. In the event of a dispute as to the amount necessary to cure, the District shall seek an expedited hearing thereon. The District or any other Successful Bidder shall have the right to remove any such executory contract and/or unexpired lease from the list of contracts and/or leases to be assumed and assigned in the event the amount necessary to cure is higher than projected and/or higher than what the District or such other Successful Bidder is willing to pay in its sole and absolute discretion.

## D.    The Final Sale Order

41.    The Final Sale Order shall contain terms including, without limitation, findings and conclusions that:

> (a)    the District, District Designee, or other Successful Bidder is (i) not a successor to the Debtors; (ii) not a sponsor of any condo-conversion, and (iii) entitled to a finding that the District, District Designee, or other Successful Bidder is a good-faith purchaser;

> (b)    the District and the District Designee as the Successful Bidder or any other Successful Bidder is (i) entitled to the protections consistent with and found in 11 U.S.C. § 363(m); and (ii) that the Sale is final and not subject to reversal or modification on appeal;

> (c)    the Sale was conducted in good-faith and at arms length; and

> (d)    the Property shall be free and clear of all liens, claims, interests and encumbrances with all valid liens, claims, interests and encumbrances to attach to the proceeds of Sale in lieu of the Property.[4] In the event the District is the Successful Bidder, the Property shall be conveyed without prejudice or waiver of any rights to enforce, or cause the enforcement of, the collection of any delinquent installments of the City Center Bond Assessments securing the Bonds not satisfied by the Sale, against all third parties other than the Debtors, their affiliates, and the Retained Assets, and such reservation shall include but not be limited to future principal amounts, interest, penalties, or other amounts arising from any installments or maturity payments.

42.    The Final Sale Order shall also be conditioned upon, subject to, incorporate and preserve all the rights and protections resulting from the entry of an order confirming the Consensual Plan (the "**Confirmation Order**") and the Sale shall be deemed a sale "under a plan confirmed under section 1129 of [the Bankruptcy Code]."11 U.S.C. § 1146(a); see Florida Dept. of Revenue v. Piccadilly, 128 S. Ct. 2326 (2008). However, in the event that for some reason the protection of Sections 1146(a) are not available within the deadlines for a Closing set forth in this Motion (e.g., because the Plan is not timely confirmed, the Bankruptcy Court rules that the

---

[4] Except *ad valorem* real property taxes and outstanding O&M Assessments pursuant to the PSA.

protections of Section 1146(a) do not apply, or for some other reason), the District Designee (if it is the Successful Bidder) or other Successful Bidder may elect to waive such protections under Section 1146(a) and proceed to Closing if the Successful Bidder pays the required documentary stamp taxes. Moreover, in such event, the Debtors may compel the District Designee or other Successful Bidder to proceed to Closing if the Debtors pay the required documentary stamp taxes.

43. **Finality**. The Bondholder, Indenture Trustee and District have continuously and vigorously stressed during the negotiations leading up to this motion with the Debtors, their professionals, the CRO and the Court, that one of the most material conditions to this process moving forward on a consensual basis is that it will yield finality with respect to the claims of the District and the respective rights of the Co-Plan Proponents. No installments due on the City Center Bond Assessments have been paid for over five (5) years, since 2008, and the District's foreclosure action has been ongoing for over four (4) years. The Debtors share the desire of the other parties to this motion for a final resolution of disputes and for the creation of the sale process that will achieve such final resolution.

44. As such, by filing this motion, the Debtors, their professionals, the CRO, and the equity interests of the Debtors, as evidenced by the joinders and consents attached hereto, and the remaining Co-Plan Proponents, all hereby stipulate without reservation that they (i) will not and may not withdraw, modify or terminate this motion or any related documents necessary to complete the Sale process, including but not limited to, the Consensual Plan (which shall contain provisions that are consistent with the terms of this motion) when filed, (ii) will not and may not object to this document or any related documents including, but not limited to, the Consensual Plan, (iii) will not and may not otherwise interfere, delay or impair this Sale process either directly or indirectly; (iv) will consent to or will join in all documents necessary to convey good title to the Property to the Successful Bidder (whether the District or a third party); and (v) agree,

subject to the procedures set forth herein, in the event of a default by any of the Debtors, the CRO and/or any affiliate of the Debtors, to have the Sale deemed consummated and title to the Property transferred to the District Designee by the earlier of (a) the Closing; or (b) the transfer of deeds to the District Designee in the event of an uncured default by the Debtors, the CRO and/or any affiliate of the Debtors or (c) September 3, 2014 (the "**Outside Date**"). The Debtors' direct or indirect delay or impairment of the sale process in violation of the terms of this Motion shall be an event of default. If the default is a Curable Default (as defined below), the District, Trustee and Bondholder may provide written notice of such default to the Debtors (a "**Default Notice**"), and the Debtors shall have five (5) days to cure such Curable Default. If the District, Trustee and Bondholder conclude, in their sole discretion, that the default is an Uncurable Default (as defined below), or if they have delivered a Default Notice as to a Curable Default that the Debtors have failed to timely cure, they may give written notice to the Debtors that they seek to terminate the sale process and seek the immediate delivery of deeds sufficient to convey title to all underlying parcels of the Property as if the Sale had occurred and the District Designee had been the Successful Bidder. The District, Trustee and Bondholder shall file an emergency motion for the entry of an order compelling the delivery of the instruments of conveyance, accompanied by an affidavit of default that shall specify the event of default and why it is either a Curable Default that the Debtors have failed to cure, or an Uncurable Default. The Debtors shall have seventy-two business hours to file a response and counter-affidavit, and the Court shall hear the motion on an emergency basis. If the Court finds that the default is a Curable Default as to which the Debtors have not had the opportunity to cure, the Court may order the curing of the Curable Default within the five (5) days as provided in this paragraph and compliance with the sales process and deadlines as set forth herein. A "Cure" shall mean mean, *inter alia*, restoration of all timelines mandated herein. A "Curable Default" is a default that is capable of being Cured; an "Uncurable Default" is a default that cannot be cured (e.g., if the

timelines cannot be restored, the default is not a Curable Default but is rather an Uncurable Default). In the event of an Uncurable Default or a Curable Default that has not been cured within the time fixed by the Court, the Court shall order the delivery of the instruments of conveyance to the District. The Bid Procedures Order shall authorize and instruct the CRO on behalf of the Debtors to immediately execute deeds to be held in escrow consistent with the Bid Procedures Order. The CRO shall deliver such deeds to the District Designee on the earlier to occur of (i) an Order determining the existence an uncured Curable Default or an Uncurable Default; (ii) the Closing of the Sale to the District; or (iii) the Outside Date, which authority shall appear specifically on the face of the Bid Procedures Order and Final Sale Order.

## BID PROCEDURES

45.     The Co-Plan Proponents seek to sell the Property through an auction to the highest and best bidder subject to the terms and conditions provided herein (the "**Auction**"). The Debtors' Estates shall sell the Property, in one lot, to the Successful Bidder (as defined below) at the Auction, if necessary. There shall only be an Auction if there is at least one Qualified Bid (as defined below) in addition to the Stalking Horse Bid. In the event there is no Qualified Bid other than the Stalking Horse Bid, the Co-Plan Proponents shall seek the immediate entry of the Final Sale Order approving the Stalking Horse Bid as the Successful Bid and approving the District or its designee as the Successful Bidder. To the extent possible, the Final Hearing and Confirmation Hearing on the Consensual Plan shall be scheduled at the same time.

46.     The Debtors through the CRO shall close the Sale with the Successful Bidder within five (5) business days of entry of the Final Sale Order, which shall occur no later than September 3, 2014. In no event shall the Closing of the Sale occur prior to the entry of the order confirming the Consensual Plan, unless this condition is waived in writing by the Successful

Bidder. It is the intent of the Co-Plan Proponents to confirm the Consensual Plan and obtain the Final Sale Order on the same date.

47.     The Co-Plan Proponents propose the following procedures (the "**Bid Procedures**"):

(a)     **Qualified Bids**.  To constitute a Qualified Bid, each bidder other than the District must deliver to each of the respective counsel for the Co-Plan Proponents and counsel for the Debtors, in trust no later than **5:00 p.m., eastern standard time, on August 4, 2014**: (i) a signed purchase and sale contract, in form and content substantially similar to the PSA attached hereto as **Exhibit "A"**, with a redlined copy showing any changes, in an amount sufficient to comply with the Minimum Bid Requirements (defined below), without contingency of any kind; (ii) an earnest money deposit equal to $3,000,000 in cleared funds (a "**Deposit**"); and (iii) written evidence of financial ability to pay, free of any contingency, an amount equal to or in excess of the Minimum Bid Requirement (as defined below) within five (5) business days prior to the Auction date (a "**Qualified Bid**").  The Co-Plan Proponents, subject to the Court's approval, shall have the sole discretion, to determine whether a bid is a Qualified Bid (a "**Qualified Bidder**").  The Co-Plan Proponents will notify parties three (3) business days prior to the Auction date whether any bid qualified as a Qualified Bid.

(b)     **Minimum Bid Requirements**.  Any Qualified Bidder must execute a purchase and sale agreement that is in substantially the same form as the PSA which shall include a cash purchase without contingency and including an initial bid of at least $25,250,000, plus assumption or the payment of real estate taxes and outstanding O&M Assessments as set forth in the Purchase Agreement and any Cure Costs required to be paid (the "**Minimum Bid Amount**"). The Minimum Bid Amount represents an amount sufficient to satisfy the following: (i) administrative costs of the Debtors' estates for professional fees and costs, including costs of sale; and (ii) the Cure Costs, if any.  Any subsequent Qualified Bids to be made over the

Minimum Bid Amount shall be made in increments of at least $250,000 (collectively with the Minimum Bid Amount, the "**Minimum Bid Requirements**"). The Sale Notice shall contain the Minimum Bid Amount and the Minimum Bid Requirements.

(c)    **Earnest Money Deposit**. The Deposit required shall be payable by cashier's or certified check, payable to "Arnstein & Lehr LLP as escrow agent" or by wire transfer of immediately available funds on or before **August 4, 2014 at 5:00 p.m. Eastern Standard Time**. The Deposit, together with any interest accrued thereon, will be applied as a credit against the purchase price paid by the Buyer (defined below). At the conclusion of the Sale and upon Court approval of the winning bid, all Deposits made by Qualified Bidders other than the Buyer will be promptly returned (without interest); **provided, however, that a third party Qualified Bidder who makes the second highest and best bid (the "Back-Up Bid") shall remain the back-up bidder (the "Back-Up Bidder") until closing of the Sale. In the event the Back-Up Bid is the Successful Bid, the Sale to the Back-Up Bidder shall close pursuant to the Bid Procedures. In the event of a Back-Up Bidder default, the District shall become the Back-up Bidder and close the Sale by credit bid in an amount equal to its last highest credit bid, but not to exceed the Maximum Credit Bid. In the event the Successful Bidder and/or the Back-Up Bidder is unable to close the Sale, the Successful Bidder and/or Back-Up Bidder's Deposit shall be forfeited and distributed 50% to the Debtors and 50% to the Indenture Trustee for the benefit of the Bondholder. This Court shall have exclusive jurisdiction to resolve any disputes over any such Deposit.**

(d)    **Ability of the District to Credit Bid**. The Stalking Horse Bid shall be a credit bid. The District shall be entitled to credit bid up to the Maximum Credit Bid without complying with the Minimum Bid Requirements. No other party shall be permitted to credit bid or shall be excused from the Bid Procedures or Minimum Bid Requirements. The Stalking Horse Bid is deemed accepted by the Debtors and Co-Plan Proponents, subject to court approval by

way of this motion and the Bid Procedures Order.  The District shall be deemed a Qualified Bidder and is excused from having to comply with the provisions of subparagraph (a) above and shall be entitled to the protections of 11 U.S.C. § 363(m) if it is the Successful Bidder.

(e) **Higher and Better Bids**.  The Auction shall be conducted on **August 12, 2014 at 10:00 a.m. eastern standard time** at the offices of Stichter Riedel Blain & Prosser, P.A. if, and only if, there is at least one Qualified Bidder who has met the requirements for a Qualified Bidder and been accepted as a Qualified Bidder.  At the Auction, Qualified Bidders may submit bids equal to or greater than the Minimum Bid Requirements, in increments of at least $250,000.00, until the conclusion of the Auction.  The entity that submits what the Co-Plan Proponents believe constitutes the highest and best offer shall constitute the "Successful Bidder."  The bid of the Successful Bidder (the **"Successful Bid"**) shall be presented to the Court for approval on the date and time set by this Court for the final hearing to approve the Sale.  If the Court approves the Successful Bid, the Successful Bidder shall become the **"Buyer"** and shall close on the Sale as provided herein. In the event there is no Qualified Bidder other than the District, the Co-Plan Proponents shall seek immediate entry of the Final Sale Order approving the Stalking Horse Bid as the Successful Bid and the District or its designee as the Successful Bidder.

(f) **Right to Be Heard**.  The Debtors and any and all creditors, interest holders, the United States Trustee and other parties in interest, including specifically, but not limited to, the Co-Plan Proponents, may be heard as to any and all issues regarding the Sale; provided, however, that a party that is merely a Qualified Bidder is not such a party in interest.

(g) **Overbid Fee**. There shall be no Overbid Fee.

(h) **Bankruptcy Court Approval**.  The Sale contemplated herein shall be subject to the entry of a Final Sale Order.  The Final Sale Order shall be subject to and

conditioned upon the entry of the Confirmation Order and shall contain findings and conclusions, including but not limited to:

(i)     the District, District Designee, or other Successful Bidder is (i) not a successor to the Debtors; (ii) not a sponsor of any condo-conversion, and (iii) entitled to a finding that the District, District Designee, or other Successful Bidder is a good-faith purchaser;

(ii)    the District, the District Designee, or other Successful Bidder is (i) entitled to the protections consistent with and found in 11 U.S.C. § 363(m); and (2) that the Sale is final and not subject to reversal or modification on appeal;

(iii)   the Sale was conducted in good-faith and at arms length;

(iv)    the Property shall be sold free and clear of all liens, claims, interests and encumbrances with all valid liens, claims, interests, and encumbrances to attach to the proceeds of Sale, except outstanding *ad valorem* real property taxes and outstanding O&M Assessments. In the event that the District is the Successful Bidder, the Property shall be conveyed to the District Designee without prejudice to or waiver of any rights to enforce, or cause the enforcement of, the collection of any delinquent installments of the City Center Bond Assessments securing the Bonds not satisfied by the Sale, against all third parties other than the Debtors and their affiliates, including but not limited to future principal amounts, interest, penalties, or other amounts arising from any future installment or maturity amounts due;

(v)     approving the Sale and transfer of the Property to the Successful Bidder;

(vi)    confirming and incorporating the terms of the related settlement between the Settlement Parties;

(vii)   ordering the immediate effectiveness of the Final Sale Order pursuant to Rule 6004(h), Fed.R.Bankr.P. and authorizing and ordering the Successful Bidder to close at the Closing; and

(viii)   requiring the District to execute such documents and take such other actions (such as dismissal of the foreclosure and termination of any *lis pendens*) as may be necessary to effect the Sale to the Buyer and to satisfy any liens it has on the Property, other than O&M assessments.

(i)   **Forfeit of Deposit**. If any Buyer fails to close the purchase in accordance with the terms hereof, it will forfeit its Deposit and the Property will be sold to the Back-Up Bidder as described in section 47(c) above. The Buyer's forfeited Deposit shall be distributed in accordance with paragraph 47(c) above.

(j)   **No Representations**. The Property shall be purchased on an "as is, where is" basis, with no representations or warranties (express or implied) of any kind or nature whatsoever, other than the representations and warranties contained in the PSA when finalized.

(k)   **Due Diligence**. Due diligence must be completed in full, without reservation, at least one (1) business day prior to the deadline to submit a Qualified Bid.

(l)   **Marketing; Debtors' Execution of PSA**. The Debtors have hired Colliers International South Florida ("**Colliers**") to serve as broker and to market the Property in accordance with the timelines set forth herein, and the Debtors' CRO shall coordinate, manage, and direct the marketing of the Property with Colliers. The Debtors' CRO shall seek input from each of the Co-Plan Proponents as to those marketing activities and strategies, shall furnish to each of the Co-Plan Proponents a copy of the marketing book, the marketing list, and the contents of the diligence site three days prior to finalizing such materials, lists, or sites, shall solicit and consider recommendations from them, and shall provide regular reports to them as to the marketing efforts. Each of the Co-Plan Proponents may furnish the names and contact information of prospective purchasers to the CRO, who shall include all of such parties in the marketing list. The Co-Plan Proponents and CRO shall cooperate to achieve the highest and best sale of the Property. The Debtors shall forthwith file an application to employ Colliers that will set forth the compensation to be paid to Colliers in accordance with Schedule 1. The Bid

Procedures Order shall provide that the Debtors' CRO is authorized to execute all agreements necessary to implement this Motion, including the agreement with Colliers and the PSA with the Successful Bidder.

(m)    **Payment of Purchase Price**.    The purchase price for the Property as finally approved by the Court at the Sale shall be payable in full at the Closing by wire transfer of immediately available funds; provided, however, that the District shall not be obligated to pay cash up to the Maximum Credit Bid.  The Co-Plan Proponents shall pay any amounts owed as costs of Sale, including fees, costs and expenses of the Broker, if any, and out-of-pocket closing costs at Closing as set forth on **Schedule 1**.  The Buyer shall take title to the Property at Closing subject only to outstanding real estate taxes and O&M Assessments.

(n)    **Closing**.    The Sale and transfer of title to the Successful Bidder shall be consummated at the offices of Stichter Riedel Blain & Prosser, P.A. during normal business hours no later than five (5) business days after the entry of the Final Sale Order (provided that the Confirmation Order has been entered, unless such requirement is waived in writing by the Successful Bidder) (the "**Closing**").  On request of the Successful Bidder, the Debtors may extend the Closing; provided, however, that the Closing shall not be extended beyond September 3, 2014.  The proceeds from the Sale (if the District is not the Successful Bidder) shall be disbursed at Closing, subject to and consistent with **Schedule 1**.[5]  In any event that results in a Closing, the Debtors shall receive a minimum aggregate amount of $250,000 from the District or the District Designee which shall be used to pay professional fees and make a distribution to holders of allowed unsecured claims in accordance with the Consensual Plan.

## SALE NOTICE

48.    The Co-Plan Proponents further seek approval of **Exhibit "B"** as the form of notice of sale (the "**Sale Notice**").  The Co-Plan Proponents propose to serve the Sale Notice

---

[5] Pursuant to the Consensual Plan, the District shall pay, or cause to be paid, all amounts required to be paid by the District under the Consensual Plan at the time of the Closing and in accordance with the confirmed Consensual Plan.

upon (a) the Office of the United States Trustee; (b) relevant taxing authorities; (c) all known creditors and parties in interest: (d) any and all lienholders: (e) all other parties that have expressed interest in the Property; (f) any party that contacted the Debtors regarding a sale of all or any portion of the Property; and (g) any party identified by the Co-Plan Proponents as an interested party.   The Co-Plan Proponents submit that this notice procedure is reasonably appropriate in this context.

49.   For the reasons set forth in this motion, the Co-Plan Proponents submit that the Sale is justified and appropriate as is more fully described in the Consensual Plan.  The Co-Plan Proponents request that this Court schedule a preliminary hearing to approve the Bid Procedures and Sale Notice and approve the following time line:

(a)   a preliminary hearing on this motion on or around **May 2, 2014** at 9:30 a.m. to consider approval of the Sale Notice, the Stalking Horse Bid, and the Bid Procedures and seeking the entry of the Bid Procedures Order approving the proffered bid procedures and Sale processes.

(b)   mailing of the Sale Notice together with the Bid Procedures Order within twenty-four (24) hours of receiving any contact information from the District regarding any additional prospective purchaser not previously noticed;

(c)   an Auction date on or around **August 12, 2014** at 10:00 a.m.;

(d)   a final hearing date on approval of the Successful Bid within two (2) business days after the Auction date;

(e)   an outside Closing date to occur no later than five (5) business days after entry of the Final Sale Order, subject to request of the Successful Bidder to extend the Closing but in no event later than September 3, 2014; and

(f)   a confirmation hearing date on the same date as the hearing on entry of the Final Sale Order but not more than fourteen (14) days before or after the last Closing date.

50.     The Co-Plan Proponents further request waiver of the automatic operation of Rule 6004, Fed.R.Bankr.P.

## DISCUSSION

51.     The Co-Plan Proponents believe that a prompt sale of the Property presents the most viable option available to maximize value of the Estates' assets for the benefit of creditors. The Co-Plan Proponents further believe that the Auction will yield the best price in this context.

52.     This motion is being filed in conjunction with the Consensual Plan.   The Consensual Plan provides for the Sale of the Property in conjunction with the § 1146 exemption requirement of post-confirmation transfer of title from the Estates to the non-debtor purchaser. The Co-Plan Proponents have extensively negotiated the terms of this motion and request an immediate implementation of the Bid Procedures and orderly sale process as set forth herein. Accordingly, the Co-Plan Proponents believe that a sale of the Property in accordance with the terms set forth herein pursuant to the Bankruptcy Code and Consensual Plan presents the most viable option available to maximize the value of these assets for the benefit of creditors and to reduce costs to the Estates.

### A.     11 U.S. C. §§ 105, 363(b) and 1123(b)(4)

53.     The Bankruptcy Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of the case, and of property of the estate." 28 U.S.C. § 1334(e).  The broad jurisdictional grant in § 1334(e) is implemented in part by § 105, which gives the Court the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a).

54.     Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate."  § 1107(a) grants a debtor-in-possession the powers of a trustee in respect to various matters including sales under section 363(b) of the Bankruptcy Code.

55.     The Court's power to authorize a sale is to be exercised at its discretion, utilizing a flexible, case by case approach. In re Baldwin United Corp., 43 B.R. 905 (Bankr. S.D. Ohio 1984).  The key consideration is the court's finding that a good business reason exists for the sale. Stephens Indus, Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986).

> [T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business. . . . Whether the proffered business justification is sufficient depends on the case.  As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets of the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

In re Walter, 83 B.R. 14, 19-20 (9th Cir. BAP 1988), citing In re Lionel Corp, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

56.     Several sound business reasons exist for selling the Property at this time:

    (a)     The Bid Procedures for the Sale provide an open field for bidding which shall maximize the value of the Property.

    (b)     The proposed Bid Procedures will allow the highest and best bidder to purchase the Property, thereby maximizing the return to creditors.

    (c)     The Sale should provide proceeds sufficient to substantially reduce the Debtors' indebtedness and the Consensual Plan will allow for a dividend to unsecured creditors.

57.     The Auction scenario should obtain the best value for the Property. Auctions generally establish that one has paid "value" for the assets of a bankruptcy estate, where the

public sale has itself been conducted in good faith.  In re Abbotts Dairies of Pennsylvania, Inc.,

788 F.2d 143 (3d Cir. 1986).

58.    Under Florida Dept. of Revenue v. Piccadilly, 128 S. Ct. 2326 (2008) in order to

qualify for the exemptions contemplated by 11 U.S.C. § 1146(a), the sale process must be

accomplished directly through a plan.  Subject to the right of the District Designee or other

Successful Bidder to waive the protections of 11 U.S.C. § 1146(a) under the conditions set forth

in paragraph 42 above, it is the Co-Plan Proponents' intent to utilize the exemptions

contemplated by 11 U.S.C. § 1146(a), and thus the Debtors will shortly file the Consensual Plan.

The Sale is in contemplation and furtherance of the confirmation of the Consensual Plan.  To the

extent the Bankruptcy Code and Rules may not yet reflect on their face the ability of a creditor to

effect a sale free and clear of liens with the liens to attach to the proceeds, the Co-Plan

Proponents submit that Piccadilly mandates that §§ 363 and 1123(b)(4), and to the extent

necessary, 11 U.S.C. § 105, grants this Court the discretion to enter the relief sought herein and

the relief sought by the Co-Plan Proponents.

### B.    Bid Procedures are Reasonable

59.    The Co-Plan Proponents submit that the proposed Bid Procedures are reasonable

and customary for sales of this size, and are properly calculated to maximize the Property's

value.

### C.    Transfer Tax Exemption

60.    As the Sale is in contemplation, furtherance of and subject to the confirmation of

a plan of reorganization and specifically connected to the Consensual Plan, pursuant to 11 U.S.C.

§ 1146(a), the Co-Plan Proponents request that the making or delivery of an instrument or

instruments of transfer, any or all of which include the vesting, transfer and/or the sale of any

real or personal property or any direct or indirect interest therein, not to be taxed under any law

imposing any recording, registration, transfer or stamp tax or fee, or any similar tax or fee,

including any applicable transfer taxes or fees, sales taxes, or mortgage recording taxes or fees, subject to the rights of the District Designee or other Successful Bidder to waive the protections of 11 U.S.C. § 1146(a) under the conditions set forth in paragraph 42 above. The Co-Plan Proponents further request that all federal, state and local governmental agencies or departments be directed to accept and abide by the terms of the transfer tax exemption as set forth herein in connection with any transfer of the Property.

### D.    Good Faith Buyer

61.    The Co-Plan Proponents request that the order approving the Sale provide that the successful Buyer has acquired the Property in good faith.  As the Bid Procedures and notice requirements have been established to ensure that the Buyer will be a good faith purchaser, the Co-Plan Proponents believe that good faith is present here.  Specifically, while the District is authorized to credit bid its secured claim up to the Maximum Credit Bid, the Court will have the opportunity to evaluate and approve all Qualified Bids, thereby assuring objectivity.  Other than District's ability to credit bid, no "special treatment" will be afforded any Qualified Bidder.  A finding that the Buyer has acted in good faith within the meaning of Section 363(m), therefore, is appropriate and the protections of Section 363(m) shall be adopted, approved and conferred upon the Buyer of the Property.

### E.    The Sale Free and Clear of Liens is Appropriate

62.    The Co-Plan Proponents also request that, except to the extent otherwise provided in the Bid Procedures Order and Final Sale Order, the Final Sale Order shall provide that the Property be sold free and clear of any interest held by any third party except as provided herein and in the PSA.  11 U.S.C. § 363(f) authorizes the sale of the Property to be free and clear of interests in such Property held by an entity if:

(a)    Applicable non-bankruptcy law permits a sale of such property free and clear of such interests;

(b)    Such entity consents;

(c)    Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    Such interest is in <u>bona fide</u> dispute; or

(e)    Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

63.    The Co-Plan Proponents believe that all other parties that asserted or may assert liens on the Property, including the District, have consented, or will consent, to the Sale. The Co-Plan Proponents also have given notice of this proposed Sale to entities with apparent or alleged liens on the Property. Thus, the Sale will be appropriately free and clear of liens, except as otherwise provided herein and in the PSA, consistent with 11 U.S.C. § 363(f); the liens and claims of any entity claiming an interest in the Property shall attach to the sales proceeds with the same validity and priority as exist under state law consistent with § 363(e), which ensures each creditor is adequately protected.

64.    Upon Closing, as contemplated and except as provided above, the Co-Plan Proponents propose that the Buyer take title to and possession of the Property free and clear of (a) any security interests, liens or encumbrances of any kind, except to the extent otherwise provided herein or in the PSA, including any administrative expenses or priority claim asserted herein and any interest of a party to a title retention arrangement intended as security, (b) any demands or claims of creditors of, or claims against, the Debtors, (c) any interests of shareholders or other interests in the Debtors, and (d) any person claiming through, by or on behalf of the Debtors, whether such claim, demand, lien or interest be direct or indirect, known or unknown, or claiming that the purchaser is a successor or successor-in-interest or pursuant to any other theory; **provided, however, that any such Buyer shall not be relieved of liability, if any, with respect to obligations accruing under the assumed contracts and leases from and after Closing, if any.**

65.    The Co-Plan Proponents request the Final Sale Order contain a waiver of the provisions of Rule 6004(g), Fed.R.Bankr.P.

**F.    Relief from the Automatic Stay**

66.    The Court has not previously granted relief from the automatic stay to the District [Dkt. No. 33]. The Co-Plan Proponents agree that the Court shall grant the District full relief from the automatic stay in the Bid Procedures Order to be limited only as follows:   In the event that the Consensual Plan is not confirmed and the Sale does not occur before September 3, 2014, the District may proceed with all rights and remedies in State Court or otherwise at its option.  If the Consensual Plan is not confirmed and the Sale does not occur before September 3, 2014, the District may then immediately proceed to complete its foreclosure process at its sole election and discretion, including, but not limited to, selling the Property at a foreclosure sale, without further order from this Court.[6]  In the interim the District may presently reset the trial date of the foreclosure case to commence no sooner than September 4, 2014, unless there exists an uncured default hereunder, at which time the District Designee shall be entitled to immediately receive deeds to the Property without further liability, notice or duties to this Court or the Debtors and the CRO shall immediately deliver the deeds to the Property to the District Designee, consistent with paragraph 44 of this motion.  In such event, the PSA shall be deemed null and void.

**G.    Approve Settlement Terms**

67.    In addition to seeking approval of this in terms of the Sale as more fully set forth herein, the Co-Plan Proponents also intend and request that this Court incorporate the terms of an overall settlement agreement between the Settlement Parties.

---

[6] In the event the Consensual Plan is not confirmed, the Co-Plan Proponents are relieved from any and all obligations and requirements to fund or make payments as set forth in the Consensual Plan or herein and may proceed with all state law remedies.  Nothing in this paragraph, however, affects the duties of all Co-Plan Proponents to effect a disposition of the Property through the sale process described in this Motion prior to the existence of a Curable Default not timely Cured, or Uncurable Defaults as defined herein, subject to the procedures set forth in paragraph 44.

68.     A court can endorse a settlement only if the compromise is fair, reasonable and adequate.  In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1026 (2d Cir. 1992) (citations omitted).  Pursuant to Eleventh Circuit law, this Court should only be asked to review the settlement for reasonableness under the factors enumerated in In re Justice Oaks II, Ltd., 898 F.2d 1544 (11th Cir.), cert. denied, 498 U.S. 959 (1990).  These factors include:

(a)     the probability of success in litigation;

(b)     the difficulties, if any, to be encountered in the matter of collection;

(c)     the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it;

(d)     the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. at 1549.  The Co-Plan Proponents submit that the settlement agreement meets the Justice Oaks II factors.

69.     It is the Co-Plan Proponents' intent and the Co-Plan Proponents hereby request that the Court approve the following terms and conditions consistent with and subject to the ultimate transfer of title of the Property to the Successful Bidder consistent with the approval sought herein in the entry of an order approving the various forms of relief set forth in this motion.  The terms and conditions include as follows:

a.      Upon Closing of the Sale (except as set forth in paragraph 69(c) below), dismissal with prejudice of all pending lawsuits by and between the Settlement Parties, with each party to bear its own attorneys' fees and costs, as follows:

i.      City Center Cmty. Dev. Dist. v. Boardwalk and Baseball, Inc., Coleridge Corp., Boardwalk Land Dev., Inc., and Brenda Nestor, Case No. 53-2009-CA-10330 Section 08, Circuit Court for the 10th Judicial Circuit, in and for Polk County, Florida (the "**Foreclosure Action**");

ii.     City Center Bonds, LLC, v. City Center Cmty. Dev. Dist., Marco Loffredo; Derrick Douglas; David Weychert; Michael Wadley; and Gregory Arnone, Case No. 53-2012-CA-002697 Section 08, Circuit Court for the 10th Judicial Circuit, in and for Polk County, Florida, subject to the conditions in paragraph c below) (the "**Circuit Court Action**"); and

      iii.     <u>Boardwalk and Baseball, Inc. Coleridge Corp., v. BTI Partners, LLC; BTI City Center Of Orlando GP Manager, LLC, separately and as Manager of BTI City Center Orlando Ventures GP, LLC, separately and as General Partner of BTI City Center Orlando Operator, LLC, separately and as Manager of City Center Bonds, LLC; and John Doe Entity #1</u>, Adv. Case No. 8:14-ap-127-MGW, U.S. Bankr. Court for the Middle District of Florida (the "**Slander of Title Action**").

      b.     The execution and delivery, upon Closing of the Sale, of mutual releases in favor of all of the Co-Plan Proponents and Settlement Parties; and

      c.     During the marketing of the Property, it is the intention of the Settlement Parties that they will not take any action to disrupt the Sale process or chill the bidding. Nor shall any of the Settlement Parties during the Sale process assert any new or additional litigation or any new or additional claims in existing litigation against one another.

      The Settlement Parties agree that the Board Supervisors of the District are obligated by law (*i.e.*, Chapters 112 and 190, Florida Statutes) to act as independent public officers. The Settlement Parties shall cooperate in requesting three (3) individuals as described below to be appointed to the District Board which process shall commence no later than ten (10) days following the entry of the Bid Procedures Order as follows:

      1.     A District Board meeting shall be scheduled within ten (10) days following the entry of the Bid Procedures Order;

      2.     At the District Board meeting referred to in the subsection immediately above, the following transition of District Board members shall occur: Debtors shall request the resignation of three (3) Board members. The Bondholder shall then nominate and present an individual to fill the first vacant board seat upon which the then existing Board shall vote to appoint said individual to the Board. The Bondholder shall then nominate and present an individual to fill the second vacant board seat upon which the then existing Board shall vote to appoint said individual to the Board. The Settlement Parties shall then nominate and present Larry S. Hyman to fill the third vacant board seat upon which

the then existing Board shall vote to appoint Mr. Hyman to the Board. Following this process, there shall be five Supervisors comprised of two Debtor representatives, two Bondholder representatives and Larry S. Hyman.

The Co-Plan Proponents and the Settlement Parties shall use their best efforts to cause three Supervisors to resign and the Board to appoint three individuals as set forth above. Only after the resignations and appointments of new board members as specifically described above, shall the Supervisors and the Co-Plan Proponents execute mutual releases that will be placed in escrow pending the Closing of the Sale. Provided that at least three (3) Board members resign and the transition of the Board occurs as set forth above, all pending litigation against the resigning supervisors shall be dismissed with prejudice within ten (10) business days after the Closing of the Sale. Within ten (10) days of the Closing of the Sale, the escrow agent shall deliver the mutual releases by and between the three resigning supervisors and the Co-Plan Proponents to the respective parties.

In the event the District is the Successful Bidder and the District Designee is the Buyer, Larry Hyman shall resign as supervisor and the remaining four (4) member board (comprised of two Debtor representatives and two Bondholder representatives) shall vote to appoint an individual nominated by the Bondholder to fill the seat vacated by Mr. Hyman. Within ten (10) business days following the appointment of the third Bondholder representative, mutual releases shall be provided from escrow to the two sitting supervisors affiliated with the Debtor and Co-Plan Proponents and all pending litigation against the two said supervisors shall be dismissed with prejudice. Thereafter supervisors shall be appointed or elected to the Board according to the District's standard procedure required by law.

Case No. 14-bk-00317-MGW
Case No. 14-bk-00318-MGW
Case No. 14-bk-00319-MGW
*Jointly Administered*

If a third party Successful Bidder is approved by the Court, then on or before the date that is ten (10) days after the Closing of the Sale to such third party Successful Bidder, Gary Moyer shall promptly seek a court order discharging himself as receiver, and all Supervisors nominated by the Bondholder as well as Mr. Hyman shall resign. Thereafter supervisors shall be appointed or elected to the Board according to the District's standard procedure required by law.

70.    The entry of the Bid Procedures Order shall constitute an assignment from the Debtors (as landowners) to the receiver, Gary Moyer, of a sufficient number of voting rights to elect three Board members at future Board elections which assignment shall terminate at the Closing of the Sale. Nothing herein shall enhance or diminish any rights that Posner Park Retail LLP or any other owner of property within the confines of the District has with respect to the selection of Supervisors following the Closing.

71.    In the event that the Sale is not timely completed or in the event of an Uncurable Default or a Curable Default that has not been cured within the time fixed by this Agreement or, if applicable, the Court, the Court shall immediately direct the CRO to deliver all documents held in escrow consistent herewith, including but not limited to deeds conveying the Property to the District Designee free and clear of all liens, claims and encumbrances except *ad valorem* real estate taxes and outstanding O&M Assessments consistent with the agreement on finality set forth more fully in paragraph 43 and 44 herein.

## CONCLUSION

72.     The Bid Procedures will allow the Debtors' Estates to sell the Property and the Buyer to assume and assign, if any, the necessary executory contracts and leases.  The Co-Plan Proponents believe that the procedures for authorizing the Sale described herein are in the best interests of the Debtors' creditors and other interested parties, will facilitate and expedite the Sale process and, in turn, will maintain and preserve the value of the Property for the benefit of all creditors in this case.  The Co-Plan Proponents believe that the Sale is necessary and justified under the circumstances and the Bankruptcy Code.  Finally, the Sale is being proposed in conjunction with the Consensual Plan and shall inure to the benefits, rights and privileges related to the confirmation of the Consensual Plan.

**WHEREFORE, BOARDWALK AND BASEBALL, INC., COLERIDGE CORPORATION, BOARDWALK LAND DEVELOPMENT, INC., CITY CENTER COMMUNITY DEVELOPMENT DISTRICT, U.S. BANK NATIONAL ASSOCIATION,** solely as indenture trustee, and **CITY CENTER BONDS, LLC,** respectfully request that the Court enter the Bid Procedures Order that specifically (i) approves the Bid Procedures set forth herein; (ii) approves the Sale Notice; (iii) approves the Stalking Horse Bid and Purchase and Sale Agreement attached as **Exhibit "A";** (iv) approves the Auction process or otherwise sets the Auction date; (v) sets a date by which any objections to the proposed Sale must be filed; (vi) approves and codifies the terms of the parties' agreement that are necessary conditions precedent to this consensual process; (vii) when appropriate, enters the Final Sale Order granting the Estates authority to sell and compelling the Closing of the Sale to the Successful Bidder; (viii) shortens any and all applicable deadlines if necessary; and (ix) grants such other and further relief as the Court deems just and proper.

Case No. 14-bk-00317-MGW
Case No. 14-bk-00318-MGW
Case No. 14-bk-00319-MGW
*Jointly Administered*

Dated:  April 9, 2014

Respectfully submitted,

**STICHTER RIEDEL BLAIN**
**& PROSSER, P.A.**
Attorneys for the Debtors
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:  (813) 229-0144
Facsimile:  (813) 229-1811
E-Mail:  hriedel@srbp.com
E-Mail:  epeterson@srbp.com

By:    /s/Edward J. Peterson
        Harley E. Riedel
        Florida Bar No. 183628
        Edward J. Peterson, III
        Florida Bar No. 0014612

**ARNSTEIN & LEHR LLP**
Attorneys for City Center Bonds LLC
200 South Biscayne Boulevard, Suite 3600
Miami, Florida 33131
Telephone: 305-374-3330
Facsimile: 305-374-4777
E-Mail: pmhudson@arnstein.com

By: /s/ Phillip M. Hudson
        Phillip M. Hudson III
        Florida Bar No. 518743

**GLENN RASMUSSEN, P.A.**
Counsel for the District
100 S. Ashley Drive, Suite 1300
Tampa, Florida 33602
Telephone:  (813)229-3333
Facsimile:   (813)229-5946
E-Mail:  rglenn@glennrasmussen.com

By:  /s/Robert S. Glenn
        Robert S. Glenn
        Florida Bar No. 159844

**GREENBERG TRAURIG, P.A.**
Counsel for the Indenture Trustee
333 Avenue of the Americas
Miami, Florida 33131
Telephone: (305) 579-0730
Facsimile: (305) 579-0717
E-Mail:   huttonj@gtlaw.com

By: /s/ John B. Hutton, III
        John B. Hutton, III
        Florida Bar No. 902160

Case No. 14-bk-00317-MGW
Case No. 14-bk-00318-MGW
Case No. 14-bk-00319-MGW
*Jointly Administered*

## JOINDER AND CONSENT

Brenda Nestor, as personal representative of the Estate of Victor Posner, hereby joins in and consents to the Joint Motion for Authority to (I) Sell Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims and Encumbrances, (II) Establish Sale Procedures, (III) Set a Hearing Date on Sale, (IV) Approve Form of Notice and Shortened Notice in Connection With Consensual Plan of Reorganization and (V) Approve and Codify Settlement Terms filed in the following bankruptcy cases pending in the U.S. Bankruptcy Court for the Middle District of Florida:

a.   In re Boardwalk and Baseball, Inc., Case No. 14-bk-00317-MGW;

b.   In re Boardwalk Land Development, Inc., Case No. 14-BK-00317-MGW; and

c.   In re Coleridge Corporation; Case No. 14-BK-00317-MGW

_____ 3/31/14
Brenda Nestor
as Personal Representative of the Estate of Victor Posner

Case No. 14-bk-00317-MGW
Case No. 14-bk-00318-MGW
Case No. 14-bk-00319-MGW
*Jointly Administered*

## JOINDER AND CONSENT

Brenda Nestor, individually, hereby joins in and consents to the Joint Motion for Authority to (I) Sell Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims and Encumbrances, (II) Establish Sale Procedures, (III) Set a Hearing Date on Sale, (IV) Approve Form of Notice and Shortened Notice in Connection With Consensual Plan of Reorganization and (V) Approve and Codify Settlement Terms filed in the following bankruptcy cases pending in the U.S. Bankruptcy Court for the Middle District of Florida:

a.    <u>In re Boardwalk and Baseball, Inc.</u>, Case No. 14-bk-00317-MGW;

b.    <u>In re Boardwalk Land Development, Inc.</u>, Case No. 14-BK-00317-MGW; and

c.    <u>In re Coleridge Corporation</u>; Case No. 14-BK-00317-MGW

_____ 3/31/14
Brenda Nestor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the Joint Motion for Authority to (I) Sell Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims And Encumbrances, (II) Establish Sale Procedures, (III) Set a Hearing Date on Sale, (IV) Approve Form of Notice and Shortened Notice in Connection with Consensual Plan of Reorganization and (V) Approve and Codify Settlement Terms with Exhibits was furnished on this 9th day of April, 2014, by either the Court's CM/ECF electronic noticing system or by U.S. Mail to:

Office of the U.S. Trustee
All creditors and parties in interest on attached matrix

*/s/ Edward J. Peterson, III*
Edward J. Peterson, III

Label Matrix for local noticing
113A-8
Case 8:14-bk-00317-MGW
Middle District of Florida
Tampa
Wed Apr  9 10:30:59 EDT 2014

Boardwalk Land Development, Inc.
3310 Lake Ridge Lane
Weston, FL 33332-2507

Boardwalk and Baseball, Inc.
Jointly Administered
14-bk-318 Coleridge Corporation
14-bk-319 Boardwalk Land Developmnt Inc.
3310 Lake Ridge Lane
Weston, FL 33332-2507

City Center Community Development District
c/o Edwin G. Rice
100 S. Ashley Drive, Suite 1300
Tampa, FL 33602-5309

Coleridge Corporation
3310 Lake Ridge Lane
Weston, FL 33332-2507

JOE G TEDDER POLK COUNTY TAX COLLECTOR
PO BOX 2016
BARTOW, FL 33831-2016

Soneet Kapila
1000 South Federal Highway
Suite 200
Ft. Lauderdale, FL 33316-1237

Brenda Nestor
Lennox Law, P.A.
4905 S. Westshore Blvd.
Tampa, FL 33611-3329

Pension Benefit Guaranty Corporation
Office of the Chief Counsel
1200 K Street, N.W.
Washington, DC 20005-4026

Rizzetta & Company,Inc.
c/o Patrick M. Mosley
Hill, Ward & Henderson, P.A.
P.O. Box 2231
Tampa, FL 33601-2231

Michael G. Williamson
Tampa

APL/NVF Consolidated Pension Plan
c/o Pension Benefit Guaranty Corp.
1200 K Street, N.W.
Washington, DC 20005-4025

Akerman & Senterfitt
1 SE 3rd Ave., 28th Floor
Miami, FL 33131-1715

Brenda Nestor
c/o Andrew Lennox, Esq.
4905 S. Westshore Blvd.
Tampa, FL 33611-3329

Bright House Networks
P.O. Box 30765
Tampa, FL 33630-3765

Capone-CLTRL, Assignee Roth Acq.
P.O. Box 54423
New Orleans, LA 70154-4423

City Center Bonds, LLC
c/o Phillip M. Hudson III
200 South Biscayne Blvd., Suite 3600
Miami, Florida 33131-2395

City Center Community Dev. District
c/o DPPG
1060 Maitland Ctr Commons Blvd.
Suite 340
Maitland, FL 32751-7273

City Center Community Dev. District
c/o Scott Clark, Esq. and
Mitchell Albaugh, Esq.
700 W. Morse Blvd., #101
Winter Park, FL 32789-3768

City Center Community Development District
c/o Robert B. Glenn
Glenn Rasmussen, P.A.
100 S. Ashley Drive, Suite 1300
Tampa, FL 33602-5364

Department of Labor and Security
Hartman Building Suite 307
2012 Capital Circle Southeast
Tallahassee FL 32399 0648

Department of Revenue
PO Box 6668
Tallahassee FL 32314-6668

Duke Energy, Inc.
P.O. Box 14042
Saint Petersburg, FL 33733-4042

Estate of Victor Posner
3310 Lake Ridge Lane
Weston, FL 33332-2507

Florida Refuse Service
P.O. Box 9001099
Louisville, KY 40290-1099

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

JOE G TEDDER, CFC -
POLK COUNTY TAX COLLECTOR
DELINQUENCY AND ENFORCEMENT
PO BOX 2016, BARTOW, FL 33831

Kellerhals Ferguson & Fletcher -
501 E. Kennedy Blvd., #802
Tampa, FL 33602-5201

Linda Nestor
Attorney Andrew W. Lennox
Lennox Law, P.A.
4905 S. Westshore Blvd.
Tampa, FL 33611-3329

Modica & Associates
302 Mohawk Rd.
Clermont, FL 34715-7434

Office of US Attorney
Attn Civil Process Clerk
400 North Tampa St Suite 3200
Tampa FL 33602-4774

Pension Benefit Guaranty Corporation
(US Government Agency)
1200 K Street, N.W.
Washington, D.C 20005-4026


Pension Benefit Guaranty Corporation -
Attn: Kelly Cusick, Attorney
Office of the Chief Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026

Polk County BOCC
Land Development Division
330 West Church St.
Bartow, FL 33830-3760

Polk County Tax Collector
P.O. Box 1189
Bartow, FL 33831-1189


Reichardt Lien Fund I, LLC
167 Adams St.
Denver, CO 80206-5211

Rizzetta & Company, Inc.
Patrick M. Mosley, Esq.
101 E. Kennedy Blvd, Suite 3700
Tampa, FL 33602-5195

Rizzetta & Company, Inc.
c/o Patrick M. Mosley, Esq.
Hill, Ward & Henderson, P.A.
P.O. Box 2231
Tampa, FL 33601-2231


Sentry Barricades, Inc.
P.O. Box 3647
Lakeland, FL 33802-3647

Soneet R Kapila
of Kapila & Company
1000 S Federal Hwy, Suite 200
Ft Lauderdale, FL 33316-1237

Stearns Weaver Miller
P.O. Box 3299
Tampa, FL 33601-3299


TC 12, LLC -
P.O. Box 3385
Tampa, FL 33601-3385

U.S. Bank National Association, solely as in
c/o John B. Hutton, Esq.
Greenberg Traurig, P.A.
333 SE 2nd Ave., Suite 4400
Miami, FL 33131-3238

US Bank National Association
C/O John B Hutton, Esq
Greenberg Traurig, PA
333 SE 2nd Ave Ste 4400
Miami, FL 33131-3238


US Bank National Association
c/o John B Hutton, ESq.
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131-2184

John B Hutton +
Greenberg Traurig PA
333 Avenue of the Americas
Suite 4400
Miami, FL 33131-3238

Edwin G Rice +
Glenn Rasmussen, PA
PO Box 3333
100 South Ashley Drive, Suite 1300
Tampa, FL 33602-5364


United States Trustee - TPA +
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602-3949

Soneet  R Kapila +
Post Office Box 14213
Fort Lauderdale, FL 33302-4213

Robert B Glenn +
Glenn Rasmussen, PA
100 South Ashley Drive, Suite 1300
Tampa, FL 33602-5364


Denise E Barnett +
United States Trustee
501 East Polk Street
Suite 1200
Tampa, FL 33602-3945

Phillip M Hudson III +
Arnstein & Lehr LLP
200 South Biscayne Boulevard
Suite 3600
Miami, FL 33131-2395

Andrew W Lennox +
Lennox Law, P.A.
4905 S. Westshore Boulevard
Tampa, FL 33611-3329


Edward J. Peterson III +
Stichter, Riedel, Blain & Prosser, PA
110 East Madison Street, Suite 200
Tampa, FL 33602-4718

Patrick Mosley +
Hill, Ward, Henderson
101 E. Kennedy Blvd., Suite 3700
P.O. Box 2231
Tampa, FL 33601-2231

Kelly Rose Cusick +
Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, DC 20005-4026


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Internal Revenue Service -
P.O. Box 21126
Philadelphia, PA 19114

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)City Center Bonds LLC                (u)Stichter, Riedel, Blain & Prosser, P.A.        (u)U.S. Bank National Association, solely as

(d)Bright House Networks               (d)Duke Energy, Inc.               (d)Florida Refuse Service
P.O. Box 30765                         P.O. Box 14042                     P.O. Box 9001099
Tampa, FL 33630-3765                   Saint Petersburg, FL 33733-4042    Louisville, KY 40290-1099

(u)Note: Entries with a '+' at the end of the      End of Label Matrix
name have an email address on file in CMECF        Mailable recipients     56
-------------------------------------------        Bypassed recipients      7
Note: Entries with a '-' at the end of the         Total                   63
name have filed a claim in this case

# EXHIBIT A

## AGREEMENT FOR PURCHASE AND SALE OF PROPERTY

**THIS AGREEMENT FOR PURCHASE AND SALE OF PROPERTY** (the "**Agreement**") is made and entered into as of the last date of execution indicated below, between and among **BOARDWALK AND BASEBALL, INC.**, and **COLERIDGE CORPORATION**, as Debtors-in-Possession under Case Nos. 14-bk-00317-MGW and 14-bk-00318-MGW, respectively (collectively, "**Sellers**" or "**Debtors**"; each one a "**Seller**" or "**Debtor**")[1], and **CITY CENTER COMMUNITY DEVELOPMENT DISTRICT**, a community development district (the "**District**" or "**Buyer**")[2]. Sellers and Buyer are together sometimes referred to herein as the "**Parties**," and each a "**Party**."[3]

## RECITALS

A.    On January 13, 2014, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (collectively the "**Bankruptcy Cases**"). The Bankruptcy Cases are jointly administered as Case No. 14-bk-00317-MGW, in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "**Bankruptcy Court**").

B.    Sellers are the debtors-in-possession in the Bankruptcy Cases within the meaning of 11 U.S.C. §§ 1107 and 1108 and each owns all right, title and interest in those certain real properties, being more particularly described on **Composite Exhibit "A"** (the "**Real Property**"), which term is used to and includes all improvements (the "**Improvements**") owned by Sellers and/or located upon the Real Property, and such Sellers' interest, if any, in and to (i) all strips and gores of land lying adjacent to the property, lands underlying any adjacent streets or roads, easements, privileges, rights-of-way, riparian and other water rights, and other appurtenances pertaining to or accruing to the benefit of the Real Property; (ii) all fixtures currently located on the Real Property (the "**Personal Property**"); (iii) all licenses, permits, contract rights, development rights, entitlements and approvals pertaining to the ownership operation and/or proposed development of the Real Property, including, but not limited to, the existing development rights, governmental approvals, density rights, licenses, contract rights, impact fee credits, permits, licenses, development orders and building permits, including without limitation any rights with respect to the Development Order for Circus World, a Development of Regional Impact, DRI 86-1, recorded in Official Records Book 2505, Page 1630, of the Public Records of Polk County, as amended from time-to-time, and the terms and conditions of that Development Agreement for Victor Posner City Center DRI – PHASE 1 recorded May 22, 2006 in Official

---

[1] While not technically a seller under this Agreement or the process set forth herein, a third debtor, Boardwalk Land Development, Inc., shall participate and be bound by the terms of the Bid Procedures Order and shall be a co-proponent of the Consensual Plan as set forth in the Sale Procedure Motion.

[2] Notwithstanding that the District is the Buyer under this Agreement, title to the Property shall transfer at Closing to the Bondholder or the Bondholder's designee. It is expressly intended by the Parties that the Bondholder is an intended third party beneficiary of this Agreement.

[3] All terms not defined herein shall have the meaning set for the in Sale Procedures Motion.

Polk County, as amended from time-to-time, and the terms and conditions of that Development Agreement for Victor Posner City Center DRI – PHASE 1 recorded May 22, 2006 in Official Records Book 6787, Page 503, as affected by Restated, Amended & Updated Development Agreement for Victor Posner City Center DRI – PHASE 1 recorded November 16, 2006 in Official Records Book 7059, Page 1074, and Restated, Amended, Updated Development Agreement for Victor Posner City Center Development of Regional Impact recorded January 27, 2010 in Official Records Book 8063, Page 1200, and Restated, Amended, and Updated Development Agreement for Victor Posner City Center Development of Regional Impact recorded August 13, 2013 in Official Records Book 9032, Page 2036, of the Public Records of Polk County, Florida (collectively, the "**DRI Rights**"); and (iv) all of Sellers' general intangible rights pertaining to ownership and proposed development of the Real Property (all of Sellers' interest in the Real Property, Improvements, the Personal Property and all other property and rights described in this Recital B are collectively referred to as the "**Property**"). The Property shall be sold as one lot and shall not be offered in smaller parcels.

C.    The District, City Center Bonds, LLC, a Delaware limited liability company (the "**Bondholder**"), and U.S. Bank National Association, solely as indenture trustee (the "**Indenture Trustee**" and together with the District, Sellers, the Bondholder and Boardwalk Land Development, Inc., collectively, the "**Co-Plan Proponents**"), have agreed with the Debtors to file a consensual plan of reorganization (the "**Consensual Plan**"), for the Debtors' estates (the "**Estates**") consistent with this Agreement.

D.    The Co-Plan Proponents have filed or shall file in the Bankruptcy Cases a motion to establish procedures to obtain the highest and best bid for the sale of the Property (the "**Sale Procedures Motion**").

E.    The Sale Procedures Motion shall seek the entry of an order (the "**Bid Procedures Order**") (i) allowing for due diligence to be completed in full, without reservation, at least one (1) business day prior to the deadline to submit a Qualified Bid (the "**Due Diligence Period**"), (ii) establishing a date by which offers on the Property are due, (iii) setting forth the requirements of a "**Qualified Bid**" and "**Qualified Bidder**," (iv) stating that Qualified Bidders must submit bids to the Co-Plan Proponents and each of their respective counsel no later than August 4, 2014, (v) setting an auction date and location for the sale of the Property (the "**Auction**"), (vi) establishing the bidding procedures and deposit amounts for Qualified Bidders to participate in the Auction, (vii) providing for customary "stalking horse" protections; and (viii) containing the terms of the agreements and compromises agreed to by and between the Co-Plan Proponents and certain third parties including, but not limited to, Brenda Nestor, individually, and the probate estate of Victor Posner. In submitting the Sale Procedures Motion, the Debtors have agreed that they and their principals may not, directly or indirectly, withdraw, retract, terminate, object to or otherwise modify the Sale Procedures Motion, the Bid Procedures, and/or the settlement terms contained therein, without the written consent of the other Co-Plan Proponents.

Page 2 of 14

F.     The Consensual Plan and the Bid Procedures Order shall provide that the District shall be entitled to a credit bid at the Auction in exchange for its compromise and release of claims and liability as to the Debtors (including Boardwalk Land Development, Inc.) and their affiliates and its partial release of liens to the extent the Credit Bid is the successful bid, which encumber the Property as of the date hereof (the "**Credit Bid**").

G.     Pursuant to the Bid Procedures Order, to the extent the Credit Bid is the successful bid, the District shall purchase the Property with the Bondholder or Bondholder's designee taking title directly from the Sellers, and in connection therewith, the District hereby submits its "stalking horse" bid of TWENTY-FIVE MILLION AND NO/100 DOLLARS ($25,000,000.00) (the "**Stalking Horse Bid**").

H.     The Bid Procedures Order shall provide for a maximum credit bid in an amount agreed to by the Debtors and Buyer (the "**Maximum Credit Bid**"), and if a bid submitted by a Qualified Bidder exceeds the District's Maximum Credit Bid, the Bankruptcy Court may consider such Qualified Bidder as the Successful Bidder (as hereinafter defined).

I.     The Bid Procedures Order shall provide *inter alia* that, after the Auction, the Bankruptcy Court shall conduct a final hearing to determine the highest and best offer (the "**Successful Bidder**") and enter a final sale order (the "**Final Sale Order**").  The Closing shall occur no later than September 3, 2014.

J.     The Sale and the Auction are in conjunction with the Consensual Plan and the Co-Plan Proponents shall seek confirmation of the Consensual Plan simultaneously to or immediately prior to or after the issuance of the Final Sale Order.

K.     The Bid Procedures Order shall provide that the Property shall be sold as one lot and that the initial bid on the Property will begin at TWENTY-FIVE MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($25,250,000.00) plus any Cure Costs required to be paid, if any (the "**Minimum Bid Amount**"), with subsequent bids required to be made over the Minimum Bid Amount in increments of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00).

L.     The Bid Procedures Order shall provide that if the District is not the Successful Bidder at the Auction and if there is a third party which is the Successful Bidder (the "**Third Party Successful Bidder**"), a third party Qualified Bidder who makes the second highest and best bid (the "**Back-Up Bid**") shall remain the back-up bidder (the "**Back-Up Bidder**") until closing of the Sale.  In the event the Back-Up Bid is the Successful Bid, the Sale to the Back-Up Bidder shall close pursuant to the Bid Procedures.  In the event of a Back-Up Bidder default, the District shall become the Back-Up Bidder and close the Sale by credit bid in an amount equal to its last highest credit bid, but not to exceed the Maximum Credit Bid.

M.     Buyer wishes to purchase the Property and Sellers are willing to sell the Property to Buyer for the price and pursuant to the terms and conditions of this Agreement, subject to the

Page 3 of 14

11576285.2

approval of the Bankruptcy Court. The Buyer may assign its right to close, if it is the Successful Bidder, to the Bondholder or its designee, who shall be entitled to all right, protections, exceptions and exclusions, including but not limited to the safe harbor protections of 11 U.S.C. § 1146.

N.     The Bid Procedures Order shall include that in the event the District Designee[4] takes title to the Property, the future Special Assessments, O&M Assessments, any liens related thereto and the Bonds shall remain unaffected by the transfer of the title to the Property.

Therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the terms and conditions set forth below.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and agreements herein, and for other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged by the Parties, it is agreed as follows:

1.     Incorporation. The recitals to this Agreement and all Exhibits referred to in this Agreement are hereby incorporated into and made a part of this Agreement.

2.     Stalking Horse Bid. Subject to the terms and conditions of this Agreement and Bankruptcy Court approval, Sellers agree to convey the Property to Buyer and Buyer agrees to purchase the Property from Sellers for the purchase price in an amount equal to the Stalking Horse Bid. Buyer will pay the Stalking Horse Bid as follows:

(a)     A Credit Bid of TWENTY FIVE MILLION NO/100 DOLLARS (Subject to the terms of this Agreement, Buyer is entitled to credit bid up to the Maximum Credit Bid).

$ 25,000,000.00

(b)     Plus Cure Costs as more fully described in the Sale Procedures Motion.

$          TBD

3.     Title. Sellers shall convey to the District Designee by deed all of Sellers' right, title, and interest in and to the Property free and clear of all liens, claims, encumbrances, liabilities, obligations, mortgages, security interests and interests in accordance with the provisions of 11 U.S.C. §§ 1123(a)(5)(D) and 1129, except outstanding *ad valorem* real estate taxes, and outstanding and overdue O&M Assessments, and for those (i) restrictions–and limitations of record affecting the Property, (ii) easements for public utilities that may be of

---

[4] The District Designee shall be the Bondholder or the Bondholder's designee.

Page 4 of 14

11576285.2

record, and any pending special assessments or governmental liens, (iii) zoning restrictions and prohibitions imposed by any governmental authority or governmental unit (as defined in 11 U.S.C. § 101((27)), and (iv) restrictions, easements, and other matters appearing on the plat or common to the subdivision or neighborhood, all of the foregoing which do not render title to the Property unmarketable. At least ten (10) days prior to the Auction, Buyer shall obtain, at its own expense, a title insurance commitment issued by Arnstein & Lehr LLP, as agent for First American Title Insurance Company (the "**Commitment**"). Sellers shall convey title to the Buyer or Buyer's designee, with the protections of 11 U.S.C. §§ 1123(a)(5)(D) and 1129, provided such protections are approved by the Bankruptcy Court, and shall provide to the Buyer a certified copy of the Final Sale Order, pursuant to 11 U.S.C. §§ 1123(a)(5)(D) and 1129.

    4.    Sellers' Representations and Warranties. Each Seller represents and warrants to Buyer as follows:

        (a)    Sellers' Existence. Each Seller is a Chapter 11 debtor-in-possession, and each has full power and authority to sell the Property, to comply with the terms of this Agreement, and to consummate the transactions contemplated hereunder, subject to the entry of the Sale Procedures Motion and the Final Sale Order by the Bankruptcy Court.

        (b)    Authority.    Subject to the other provisions of this Agreement, the execution and delivery of this Agreement by Sellers and the consummation by Sellers of the transaction contemplated by this Agreement are within Sellers' capacity.

        (c)    Sellers' Cooperation.    Upon request of Buyer, Sellers shall, to the extent available, provide copies of or access to enable Buyer to make copies of all plans, drawings, specifications, reports or other documents relating to the Property.    In addition, and where necessary, Sellers shall assume all such agreements the Buyer requests Sellers to assume, for further assignment to the Buyer at Closing, including the right to use for any lawful purpose any plans, drawings, specifications, reports or other documents prepared for Sellers by any third party and relating to the Property. Each such assumption shall be expressly conditioned upon (i) Buyer's agreement to accept further assignment to Buyer at Closing; and (ii) Buyer's agreement to pay all necessary cure costs and related fees.

        (d)    No Other Representations and Warranties.    Buyer acknowledges that Sellers are Debtors and that, except as expressly set forth herein, Sellers have not made any warranties or representations concerning the Property or any component thereof, including, without limitation, the operation of or the costs or results of the operation thereof; the condition of the Improvements; the zoning or other land use restrictions affecting the Property; the compliance of the Property or any part thereof with any governmental requirement; the use or existence or prior use or existence of hazardous material on the Property; or the accuracy or completeness of any statement or other matter previously disclosed to Buyer. Buyer represents that it is purchasing the Property in an "**AS-IS, WHERE-IS**" condition, Buyer having made (or having had the opportunity to make during or prior to the Investigation Period) its own

Page 5 of 14

inspection and examination of the Property and all components thereof. **EXCEPT AS SPECIFICALLY PROVIDED FOR HEREIN, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES GIVEN TO BUYER IN CONNECTION WITH THE SALE OF THE PROPERTY. SELLERS HEREBY DISCLAIM ANY AND ALL WARRANTIES OF MERCHANTABILITY, HABITABILITY, AND FITNESS THAT MAY BE DUE FROM SELLERS TO BUYER. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THIS SECTION SHALL SURVIVE THE CLOSING.**

     5.    <u>Buyer's Representations and Warranties</u>. Buyer represents and warrants to Sellers as follows:

     (a)    <u>Buyer's Existence</u>. Buyer has full power and authority to purchase the Property and to comply with the terms of this Agreement. If Buyer is other than an individual, Buyer is duly organized, validly existing, in good standing, and qualified to do business under the laws of the State of Florida.

     (b)    <u>Authority</u>. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transaction hereby contemplated are within Buyer's capacity, and all requisite action has been taken to make this Agreement valid and binding on Buyer in accordance with its terms.

     6.    **<u>Higher and Better Offers; Bankruptcy Court Approval</u>. THIS AGREEMENT IS EXPRESSLY SUBJECT TO HIGHER AND BETTER OFFERS AND APPROVAL OF THE BANKRUPTCY COURT. Notwithstanding anything to the contrary contained herein, a condition precedent to the consummation of the transaction contemplated by this Agreement is the entry of a Final Sale Order by the Bankruptcy Court approving this Agreement and the Sale of the Property.**

     7.    <u>Closing</u>. Subject to all of the provisions of this Agreement, the Parties shall close this transaction on the date set forth in the Bid Procedures Order (as hereinafter defined) and/or the Final Sale Order (the **"Closing"** and **"Closing Date"**), commencing at 10:00 a.m., eastern standard time, or at such other time on the Closing Date as mutually agreed to by the Parties. The Closing shall take place at the offices of Stichter, Riedel, Blain & Prosser, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602, or by other means mutually agreeable to the Parties.

     8.    <u>Sellers' Closing Documents</u>. At Closing, Sellers shall execute and deliver, or obtain and deliver, as applicable, certain documents (the **"Sellers' Closing Documents"**), as follows:

     (a)    <u>Deed</u>. Deeds in the form attached hereto as **Exhibit "B,"** which shall be duly executed and acknowledged by Sellers.

Page 6 of 14

(b)    Bill of Sale. Bill of Sale transferring title ("as is, where is") to all Personal Property duly executed by the Sellers, in the form attached hereto as **Exhibit "C"**.

(c)    Order. A certified copy of the Final Sale Order.

(d)    Sellers' Affidavit. A no-lien, gap, possession and FIRPTA affidavit.

(e)    Assignment. Assignments (the "**Assignments**") in the form attached hereto as **Exhibit "D"**, duly executed by the Sellers, assigning to the District Designee, to the extent permissible, all of Sellers' right title and interest in and to (i) the licenses, permits, contract rights, development rights (including the DRI Rights), and approvals pertaining to the ownership and/or operation of the Real Property, and (ii) the general intangible rights pertaining to ownership of the Real Property.

(f)    Closing Statement. A Closing Statement setting forth the Stalking Horse Bid as the purchase price, Deposit, if any, the Cure Costs and all closing costs due from Buyer, and the net cash to close due to Sellers and the District (if applicable) (the "**Closing Statement**") duly executed by the Parties.

9.    Buyer's Closing Documents. At Closing, Buyer shall execute and deliver certain documents (the "**Buyer's Closing Documents**"), as follows:

(a)    Authorizing Resolution. To the extent applicable and provided that the Buyer is not the District or the District Designee, a certified resolution of Buyer authorizing the entering into and execution of this Agreement and the consummation of the transaction herein contemplated, together with all corporate, company or partnership documents as applicable and/or required by the Commitment.

(b)    Assignments. The Assignments executed by Buyer, if any.

(c)    Closing Statement. The Closing Statement duly executed by Buyer.

10.    Conditions Precedent to Closing. In conjunction with the Consensual Plan, Closing of the Sale of the Property pursuant to the terms of this Agreement shall be conditioned upon the following:

(a)    Bid Procedures Order. Entry by the Bankruptcy Court of the Bid Procedures Order, the form of which is acceptable to the Co-Plan Proponents.

(b)    Final Sale Order. Entry by the Bankruptcy Court of a Final Sale Order, the form of which as is acceptable to the Co-Plan Proponents.

11576285.2

(c)    <u>Confirmation Order</u>.    Entry by the Bankruptcy Court of an order confirming the Consensual Plan.

(d)    <u>Approval of Purchase Agreement</u>.    Approval by the Bankruptcy Court of the terms and conditions of this Agreement.

(e)    <u>Dismissal of Litigation</u>.    The District shall file a motion to dismiss with prejudice the current foreclosure action captioned as <u>City Center Cmty. Dev. Dist. v. Boardwalk and Baseball, Inc., Coleridge Corp., Boardwalk Land Dev., Inc., and Brenda Nestor</u>, Case No. 53-2009-CA-10330 Section 08, Circuit Court for the 10th Judicial Circuit, in and for Polk County, Florida (the "**State Court**"), within ten (10) business days after the Closing.

11.    <u>Closing Procedure</u>.    The Closing shall proceed in the following manner:

(a)    <u>Credit Bid</u>.    At Closing, Buyer shall receive a credit against the Stalking Horse Bid up to the amount of the District's Maximum Credit Bid.

(b)    <u>Delivery of Documents</u>.    Not less than three (3) days prior to the Closing Date, each of the Parties shall deliver, in escrow, originals of their respective Closing Documents to the Closing Agent.

(c)    <u>Disbursement of Funds and Documents</u>.    At Closing, provided all other obligations to close have been performed, Sellers shall be entitled to the Buyer's original Closing Documents, with a copy to the Bondholder and the Indenture Trustee; Sellers shall distribute the proceeds to the Parties pursuant to the terms of the Bid Procedures Order and Final Sale Order; and Buyer shall be entitled to the Sellers' Closing Documents.

12.    <u>Real Property and Transfer Taxes</u>.    In accordance with the terms of the Final Sale Order, the Property is being sold subject to liens for real property taxes owing to Polk County. The Sale shall be in conjunction with the confirmation of the Consensual Plan, and the exemption of post-confirmation transfer of title from the Estates to the Buyer or its designee pursuant to 11 U.S.C. §1146 shall apply. However, in the event that for some reason the protection of 11 U.S.C. §1146(a) are not available within the deadlines for a Closing set forth in the Sale Procedures Motion (e.g., because the Plan is not timely confirmed, the Bankruptcy Court rules that the protections of 11 U.S.C. §1146(a) do not apply, or for some other reason), the District Designee (if it is the Successful Bidder) or other Successful Bidder may elect to waive such protections under 11 U.S.C. §1146(a) and proceed to Closing if the Successful Bidder pays the required documentary stamp taxes. Moreover, in such event, Debtors may compel the District Designee or other Successful Bidder to proceed to Closing if Debtors pay the required documentary stamp taxes.

13.    <u>O&M Assessments</u>.    The District Designee or other Successful Bidder shall also take title to the Property, subject to outstanding O&M Assessments owing to the District in the

approximate amount of ONE MILLION ONE HUNDRED SEVENTY NINE THOUSAND AND NO/100 DOLLARS ($1,179,000.00).

14.    Closing Costs; Title Insurance and Other Expenses. Costs of closing shall be paid by the Buyer as set forth in the Bid Procedures Order. Closing costs not provided for in the Bid Procedures Order which may include, but are not limited to, the documentary stamp tax and surtax, if any, on the deed; and the cost of recording the deed, the certified copies of the Final Sale Order, and any corrective instruments shall be paid by the Buyer. Buyer shall also be responsible for the payment of any and all charges and expenses in connection with any survey, abstract of title, lien searches, title examinations, title insurance premiums, soil tests, feasibility studies, appraisals, environmental audits, engineering and architectural work, and any other inspections.

15.    Possession. Buyer shall be granted full possession of the Property at Closing.

16.    Condemnation. If at any time prior to the Closing Date, any proceedings shall be commenced for the taking of all of the Property or any material portion thereof, for public or quasi-public use pursuant to the power of eminent domain, Sellers shall furnish Buyer with written notice of any proposed condemnation within five (5) days after any Seller's receipt of such notification, but in no event later than the Closing. In such event, and provided that Buyer is not otherwise in default under this Agreement, Buyer shall have the option to terminate this Agreement within fifteen (15) days after Buyer's receipt of the notice from Sellers or by the Closing Date, whichever occurs first, by sending written notice to Sellers. Should Buyer terminate this Agreement, neither Buyer, nor Sellers shall have any further rights or obligations hereunder, except as otherwise expressly provided herein. If Buyer does not elect to terminate this Agreement within the required time, then (a) the Closing shall progress as herein provided without reduction of the Stalking Horse Bid, (b) Buyer shall have the right to participate in the negotiation of any condemnation awards or other compensation for the taking, and (c) provided the Closing occurs, Sellers shall assign to Buyer or deliver to Buyer any and all awards and other compensation for such taking to which it would be otherwise entitled as owner of the Property and Sellers shall convey the portion of the Property, if any, which remains after the taking.

17.    Damage by Casualty. In the event that the Improvements or any portion thereof are damaged or destroyed by fire or other casualty prior to Closing, Sellers shall have the option to repair and restore the Property to the same condition as before the fire or casualty, provided that sufficient insurance funds are available to Sellers to pay for such repair and restoration, and Closing shall be deferred up to sixty (60) days to permit such repair and restoration. If Sellers elect not to repair and restore or if Sellers are not able to repair or restore within such sixty (60) days period, then Buyer shall have the option of either (a) canceling this Agreement, whereupon both Parties shall be released from all further obligations to each other under this Agreement, or (b) proceed with Closing in which case Buyer shall be entitled to all insurance proceeds and to a credit equal to the insurance deductibles.

11576285.2

18.    Sellers' Default.  Subject to the procedures regarding default as more specifically set forth in the Sale Procedures Motion, in the event that this transaction fails to close due to a default on the part of Sellers, Buyer shall have the right to terminate this Agreement and shall be entitled to the immediate execution and delivery of a deed or deeds sufficient to convey title to the Property to the District or its designee, or may, at its election, complete the State Court foreclosure process, with full and complete relief from the stay to do so.  The Bid Procedures Order shall so state and the Debtors shall effectuate these conveyances without delay or further order of the Bankruptcy Court, subject to the procedures regarding default as more specifically set forth in the Sale Procedures Motion.

19.    Brokers.  To be determined and agreed to by the Co-Plan Proponents.

20.    Notices.  Any notice, request, demand, instruction, or other communication to be given to either Party hereunder, except where required to be delivered at the Closing, shall be in writing and shall either be (a) hand-delivered, (b) sent by Federal Express or a comparable overnight mail service, or (c) sent by telephone facsimile transmission provided that a confirmation receipt is obtained, to Buyer, Sellers, Buyer's Attorney/Closing Agent, and Sellers' Attorney, as follows:

**Seller:**

Boardwalk and Baseball, Inc.
_____
_____
_____
Telephone:_____
Facsimile:_____

**Seller's Attorney:**

Harley E. Riedel
Stichter Riedel Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile:  (813) 229-1811

**Seller:**

Coleridge Corporation
_____
_____
_____
Telephone:_____
Facsimile:_____

**Seller's Attorney:**

Harley E. Riedel
Stichter Riedel Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile:  (813) 229-1811

**Buyer:**

City Center Community Development
District
_____
_____

**Buyer's Attorney/Closing Agent:**

Robert B. Glenn
Glenn Rasmussen, P.A.
100 S. Ashley Drive, Suite 3600
Tampa, Florida 33602

11576285.2

Telephone:_____        Telephone: 813-229-3333
Facsimile:_____        Facsimile:  813-229-5946


**Bondholder:**                           **Bondholder's Attorney:**

City Center Bonds, LLC                    Phillip M. Hudson, III
_____                   Arnstein & Lehr LLP
_____                   200 South Biscayne Boulevard, # 3600
_____                   Miami, Florida 33131
Telephone:_____         Telephone: 305-428-4522
Facsimile:_____         Facsimile: 305-808-8611

Any Notice given to the Buyer must also be given to the Bondholder for such notice to be effective. Notice shall be deemed to have been given upon receipt or refusal of delivery of said Notice. The addressees and addresses for the purpose of this paragraph may be changed by giving notice. Unless and until such written notice is received, the last addressee and address stated herein shall be deemed to continue in effect for all purposes hereunder.

    21.    Assignment. This Agreement may not be assigned without approval of the Bankruptcy Court, except Buyer may assign its right to receive title to a third party related to the Co-Plan Proponents, at any time for any reason.

    22.    Miscellaneous.

    (a)    Amendment. No modification or amendment of this Agreement shall be of any force or effect unless in writing executed by each of the Parties and approved by order of the Bankruptcy Court.

    (b)    Attorneys' Fees. Each of the Parties shall bear its own costs and attorneys' fees in connection with the execution of this Agreement and the consummation of the transaction contemplated hereby, subject, however, to the provisions of 11 U.S.C. § 506 with respect to fees, costs and charges incurred by the District. In the event of any dispute hereunder, the prevailing party shall be entitled to recover all costs and expenses incurred by it in connection with the enforcement of this Agreement, including all attorneys' fees and all costs in connection therewith as awarded by order of the Bankruptcy Court.

    (c)    Computation of Time. Any reference herein to time periods of less than seven (7) days shall exclude Saturdays, Sundays, and legal holidays in the computation thereof. Any time period provided for in this Agreement which ends on a Saturday, Sunday, or legal holiday shall extend to 4:00 p.m., eastern standard time, on the next full Business Day.

11576285.2

(d)     Counterparts.   This Agreement may be executed in any number of counterparts, any one and all of which shall constitute the contract of the Parties and each of which shall be deemed an original.

(e)     Entire Agreement.   This Agreement sets forth the entire agreement between the Parties relating to the Property and all subject matter herein and supersedes all prior and contemporaneous negotiations, understandings, and agreements (written or oral) between the Parties, and there are no agreements, understandings, warranties or representations between the Parties except as otherwise indicated herein.

(f)     Gender.   As used in this Agreement, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular as the context may require.

(g)     Governing Law; Jurisdiction.   This Agreement shall be construed in accordance with the laws of the State of Florida, without application of conflict of law rules.   To the extent the Bankruptcy Court retains jurisdiction, the Parties agree to subject themselves to the exclusive jurisdiction of the Bankruptcy Court for the purpose of adjudicating claims and disputes arising with respect to this Agreement and the transactions contemplated hereby.

(h)     Radon Gas.   Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.   Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.   Additional information regarding radon and radon testing may be obtained from the Polk County public health unit.

(i)     Section and Paragraph Headings.   The section and paragraph headings herein contained are for the purposes of identification only and shall not be considered in construing this Agreement.

(j)     Severability.   If any clause or provision of this Agreement is determined to be illegal, invalid, or unenforceable under any present or future law by final judgment of a court of competent jurisdiction, the remainder of this Agreement will not be affected thereby.   It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision that is as similar in terms to such provision as is possible to be legal, valid and enforceable.

(k)     Successors and Assigns.   This Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of the Parties, including without limitation, any Chapter 11 or Chapter 7 trustee.

(l)     Survival.   Except as otherwise expressly set forth in this Agreement, all representations and warranties of Sellers and obligations of Sellers hereunder set forth in this Agreement shall *not* survive the Closing, but shall merge into the Closing and the delivery of the

Page 12 of 14

11576285.2

Deeds, unless the Sellers (or either one of them) undertake any actions to challenge the sale contemplated herein or fail to transfer or obstruct the transfer of title to the Property in whole or in part.

       (m)   <u>Time is of the Essence</u>.  Time is of the essence in the performance of all obligations by the Parties under this Agreement.

     23.   <u>Waiver of Trial by Jury</u>.  THE PARTIES HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING, OR COUNTERCLAIM BASED ON THIS AGREEMENT OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT OR INSTRUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTION OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SUBJECT TRANSACTION.

[SIGNATURE PAGE FOLLOWS]

11576285.2

Sellers:

BOARDWALK AND BASEBALL, INC.

By: _____
Name: __Soneet R. Kapila_____
Title: __Chief Restructuring Officer__
Date: __4/8/14_____

COLERIDGE CORPORATION

By: _____
Name: __Soneet R. Kapila_____
Title: __Chief Restructuring Officer__
Date: __4/8/14_____

Buyer:

CITY CENTER COMMUNITY
DEVELOPMENT DISTRICT

By: _____
Name: _____
Title: _____
Date: _____

Page 13 of 13

11576285.2

# COMPOSITE EXHIBIT A TO AGREEMENT FOR PURCHASE AND SALE AGREEMENT

LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF POLK, STATE OF FLORIDA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

THAT PART OF SECTIONS 7, 17 & 18, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA, DESCRIBED AS: BEGINNING 117.88 FEET WEST OF THE NE CORNER OF SECTION 18, RUN S 35° E, 500.62 FEET TO POINT ON A CURVE; SOUTHERLY ALONG CURVE 306.06 FEET; THENCE SOUTH 1000 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 812.41 FEET; THENCE N 86°49'57" W, 489.51 FT TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 377.23 FEET; THENCE S 62°06'42" W, 300 FEET TO THE EAST R/W OF U.S. HIGHWAY 27; THENCE N 27°53'18" W, 1435.01 FEET; THENCE N 62°06'42" E, 25.89 FEET; THENCE N 27°53'18" W, 267.11 FEET; THENCE N 62°06'42" E, 200 FEET; THENCE N 27°53'18" W, 200 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 355.92 FEET; THENCE N 03°03'18" W, 247.78 FEET A TO POINT ON A CURVE; THENCE NORTHERLY ALONG CURVE 197.99 FEET; THENCE N 13°49'24"E, 400 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 471.89 FEET; THENCE N 62°06'42" E, 300 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY & SOUTHEASTERLY ALONG CURVE 578.67 FEET; THENCE S 35° E, 1098.24 FEET TO POINT OF BEGINNING, LESS RIGHT-OF-WAY PARCEL 118 BEING RIGHT-OF-WAY FOR I-4 AS DESC IN O.R. BOOK 4665, PAGE 1706 & LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER PHASE 1A, AS RECORDED IN PLAT BOOK 141 PAGES 48 THROUGH 50 & LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER PHASE 1B AS RECORDED IN PLAT BOOK 142 PAGES 24 THROUGH 26 & LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER PHASE 1F AS RECORDED IN PLAT BOOK 148 PAGES 1 AND 2.

PARCEL TWO:

THAT PART OF LOT 1, VICTOR POSNER CITY CENTER PHASE 1A, AS RECORDED IN PLAT BOOK 141 PAGES 48 THROUGH 50, DESCRIBED AS LYING WITHIN: BEGIN 117.88 FEET WEST OF NE CORNER OF SECTION 18, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA, RUN S 35° E, 500.62 FEET TO A POINT ON A CURVE; THENCE SOUTHERLY ALONG CURVE 306.06 FEET; THENCE SOUTH 1000 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 812.41 FEET; THENCE N 86°49'57" W, 489.51 FEET TO A POINT ON A CURVE; THENCE 5OUTHWESTERLY ALONG CURVE 377.23 FEET; THENCE S 62°06'42" W, 300 FEET TO EAST R/W OF U. S. HIGHWAY 27; THENCE N 27°53'18" W, 1435.01 FEET; THENCE N 62°06'42" E, 25.89 FEET THENCE N 27°53'18" W, 267.11 FEET; THENCE N 62°06'42" E, 200 FEET; THENCE N 27°53'18" W, 200 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 355.92 FEET; THENCE N 03°03'18"W, 247.78 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE, 197.99 FEET; THENCE N 13°49'24"E, 400 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 471.89 FEET; THENCE N 62°06'42" E, 300 FEET TO A POINT ON A CURVE; THENCE NORTHEA5TERLY & SOUTHEASTERLY ALONG CURVE 578.67 FEET; THENCE 5

35° E, 1098.24 FEET TO THE POINT OF BEGINNING, LESS RIGHT-OF-WAY PARCEL 118, BEING RIGHT-OF-WAY FOR I-4 AS DESCRIBED IN O.R. BOOK 4665-1706.

PARCEL THREE:

LOT 4, VICTOR POSNER CITY CENTER PHASE 1F, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 148, PAGES 1 AND 2, PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

PARCEL FOUR:

LOT 5, VICTOR POSNER CITY CENTER PHASE 1F, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 148, PAGES 1 AND 2, PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

PARCEL FIVE:

LOT 6, VICTOR POSNER CITY CENTER PHASE 1F, AS RECORDED IN PLAT BOOK 148, PAGES 1 AND-2, LESS THAT PART LYING WITHIN THE FOLLOWING: BEGIN AT THE NE COR OF THE NW1/4 OF THE NW1/4 OF SEC 17, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA, RUN SOUTH 1926.85 FEET' THENCE N 76°22'33" W, 943.27 FEET; THENCE WEST 45 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 969.59 FEET; THENCE S 53°41'40" W, 566.40 FEET: THENCE S 36°18'20" E, 20 FEET, THENCE S 62°06'42"W, 482.92 FEET TO ROAD R/W; THENCE N 27°53'18"W, 560 FEET; THENCE N 62°06'42"E, 300 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 377.23 FEET; THENCE S 86°49'57" E, 489.S1 FEET TO POINT ON CURVE; THENCE NORTHEASTERLY ALONG CURVE 812.41 FEET; THENCE NORTH 1000 FEET TO A POINT ON A CURVE; THENCE NORTHWESTERLY ALONG CURVE 306.06 FEET; THENCE N 35°W, 1598.87 FEET TO A POINT ON A CURVE; THENCE WESTERLY ALONG CURVE 578.67 FEET; THENCE S 62°06'42" W, 300 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 471.89 FEET; THENCE S 13°49'24" W, 400 FEET TO A POINT ON A CURVE; THENCE SOUTHERLY ALONG CURVE 197.99 FEET; THENCE S 03°03'18"E, 247.78 FT TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 355.92 FEET; THENCE S 62°06'42" W, 200 FEET: THENCE N 27°53'18" W, 250 FEET; THENCE S 62°06'42" W, 10.31 FEET TO A POINT ON A CURVE: THENCE NORTHEASTERLY ALONG CURVE 534.98 FEET; THENCE N 13°49'24" E, 1219.38 FEET; THENCE S 76°10'36" E, 16.98 FEET; THENCE N 13°49'24" E, 113.30 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 386.08 FEET; THENCE N 50°12'21"E, 1271.06 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 818.59 FEET; THENCE N 52°57'05" E, 73.87 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 828.7S FEET; THENCE N 50°12'21" E, 1174.63 FT; THENCE SOUTH 4278.03 FEET TO THE POINT OF BEGINNING.

PARCEL SIX:

TRACT B, VICTOR POSNER CITY CENTER PHASE 1F, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 148, PAGES 1 AND 2, PUBLIC RECORDS OF POLK COUNTY, FLORIDA.


PARCEL SEVEN:

Seven (a)

TRACTS D AND E, VICTOR POSNER CITY CENTER PHASE 1B, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 142, PAGES 24, 25 AND 26, PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

AND

Seven (b)

THAT PART OF SECTIONS 7, 8, 17 AND 18, TOWNSHIP 26 SOUTH, RANGE 27 EAST, POLK COUNTY, FLORIDA, DESCRIBED AS: BEGIN AT THE NORTHEAST CORNER OF THE NW1/4 OF NW1/4 OF SECTION 17, RUN SOUTH 1926.85 FEET; THENCE N 76° 22' 33" W, 943.27 FEET; THENCE WEST 45 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 969.59 FEET, THENCE S 53° 41' 40" 566.40 FEET; THENCE S 36° 18' 20" E, 20 FEET; THENCE S 62° 06' 42" W, 482.92 FEET TO ROAD R/W; THENCE N 27° 53' 18" W, 560 FEET; THENCE N 62° 06' 42" E, 300 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 377.23 FEET; THENCE S 86° 49' 57" E, 489.51 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 812.41 FEET; THENCE NORTH 1000 FEET TO A POINT ON A CURVE; THENCE NORTHWESTERLY ALONG CURVE 306.06 FEET; THENCE N 35° W, 1598.87 FEET TO A POINT ON A CURVE; THENCE WESTERLY ALONG CURVE 578.67 FEET; THENCE S 62° 06' 42" W, 300 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 471.89 FEET; THENCE S 13° 49' 24" W, 400 FEET TO POINT ON A CURVE; THENCE SOUTHERLY ALONG CURVE 197.99 FEET; THENCE S 03° 03' 18" E, 247.78 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY ALONG CURVE 355.92 FEET; THENCE S 62° 06' 42" W, 200 FEET; THENCE N 27° 53' 18" W, 250 FEET; THENCE S 62° 06' 42 W, 10.31 FEET TO A POINT ON CURVE; THENCE NORTHEASTERLY ALONG CURVE 534.98 FEET; THENCE N 13 ° 49' 24" E, 1219.38 FEET, THENCE S 76° 10' 36 E, 16.98 FEET; THENCE N 13° 49' 24" E, 113.30 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 386.08 FEET; THENCE N 50° 12' 21" E, 1271.06 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 818.59 FEET; THENCE N 52° 57' 05" E, 73.87 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY ALONG CURVE 828.75 FEET; THENCE N 50° 12' 21" E, 1174.63 FEET; THENCE SOUTH 4278.03 FEET TO THE POINT OF BEGINNING, LESS R/W PCL 132 BEING R/W FOR I-4 AS DESC IN O.R. BOOK 4665, PAGE 1706, AND LESS COMMENCE AT THE NORTHWEST CORNER OF THE NE1/4 OF SECTION 18, TOWNSHIP 26 SOUTH, RANGE 27 EAST, RUN SOUTH 178.31 FEET ALONG THE WEST LINE OF NE1/4; THENCE S 28° 01' 06" E, 614.16 FEET, THENCE N 61° 55' 54" E, 318.1 FEET, THENCE NORTHEASTERLY ALONG CURVE 24.88 FT TO THE POINT OF BEGINNING; THENCE NORTHEASTERLY ALONG CURVE 330.54 FEET; THENCE N 3° 14' 23" W, 130.79 FEET; THENCE S 20° 22' 23" W, 276.62 FEET; THENCE SOUTHWESTERLY ALONG CURVE 158.13 FEET TO THE POINT OF BEGINNING, AND LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER, AS RECORDED IN PLAT BOOK 141 PAGES 48 THROUGH 50, AND LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER PHASE 1B AS RECORDED IN PLAT BOOK 142 PAGES 24 THROUGH 26, AND LESS THAT PART LYING WITHIN VICTOR POSNER CITY CENTER PHASE 1F AS RECORDED IN PLAT BOOK 148 PAGES 1 AND-2.

AND

Seven (c)

THAT PART OF LOT 1, VICTOR POSNER CITY CENTER PHASE 1A, AS RECORDED IN PLAT BOOK 141 PAGES 48 THROUGH 50 LYING WITHIN: BEGIN AT THE NE COR OF NW1/4 OF NW1/4 OF SECTION 17, TOWNSHIP 26 SOUTH, RANGE 27 EAST, RUN SOUTH 1926.85 FEET; THENCE N 76° 22' 33" W, 943.27 FEET; THENCE WEST 45 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 969.59 FEET; THENCE S 53° 41' 40" W, 566.40 FEET; THENCE S 36° 18' 20" E, 20 FEET; THENCE S 62° 06' 42" W, 482.92 FEET TO ROAD R/W; THENCE N 27° 53' 18" W, 560 FEET; THENCE N 62° 06' 42" E, 300 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 377.23 FEET; THENCE S 86° 49' 57" E, 489.51 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 812.41 FEET; THENCE NORTH 1000 FEET TO A POINT ON A CURVE; THENCE NWLY ALONG CURVE 306.06 FEET; THENCE N 35° W, 1598.87 FEET TOA POINT ON A CURVE; THENCE WLY ALONG CURVE 578.67 FEET; THENCE S 62° 06' 42" W, 300 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 471.89 FEET; THENCE S 13° 49' 24" W 400 FEET TO A POINT ON A CURVE; THENCE SLY ALONG CURVE 197.99 FEET; THENCE S 03° O3' 18" E, 247.78 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 355.92 FEET; THENCE S 62° 06' 42" W, 200 FEET; THENCE N 27° 53' 18" W, 250 FEET; THENCE S 62° 06' 42" W, 10.31 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 534.98 FEET; THENCE N 13° 49' 24" E, 1219.38 FEET; THENCE S 76° 10' 36" E, 16.98 FEET; THENCE N 13° 49' 24" E, 113.30 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 386.08 FEET; THENCE N 50° 12' 21" E, 1271.06 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 818.59 FEET; THENCE N 52° 57' 05" E, 73.87 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 828.75 FEET; THENCE N 50° 12' 21" E, 1174.63 FEET; THENCE SOUTH 4278.03 FEET TO THE POINT OF BEGINNING, LESS R/W PARCEL 132 BEING R/W FOR I-4 AS DESCRIBED IN O.R. BOOK 4665, PAGE 1706, AND LESS: COMMENCE AT THE NW COR OF NE1/4 OF SECTION 18, TOWNSHIP 26 SOUTH, RANGE 27 EAST, RUN SOUTH 178.31 FT ALONG THE WEST LINE OF NE1/4; THENCE S 28° 01' 06" E, 614.16 FEET; THENCE N 61° 55' 54" E, 318.1 FEET; THENCE NELY ALONG A CURVE 24.88 FEET TO THE POINT OF BEGINNING; THENCE NELY ALONG CURVE 330.54 FEET; THENCE N 3° 14' 23" W, 130.79 FEET; THENCE S 20° 22' 23" W, 276.62 FEET; THENCE SWLY ALONG CURVE 158.13 FT TO THE POINT OF BEGINNING

AND

Seven (d)

THAT PART OF LOT 6, VICTOR POSNER CITY CENTER PHASE 1F, AS RECORDED IN PLAT BOOK 148 PAGES 1 AND-2, LYING WITHIN THE FOLLOWING: THAT PART OF SECTIONS 7, 8, 17 AND 18; TOWNSHIP 26 SOUTH, RANGE 27 EAST, DESCRIBED AS BEGIN AT THE NE CORNER OF THE NW1/4 OF NW1/4 OF SECTION 17; THENCE SOUTH 1926.85 FEET; THENCE N 76° 22' 33" W, 943.27 FEET, THENCE WEST 45 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 969.59 FEET; THENCE S 53° 41' 40" W, 566.40 FEET; THENCE S 36° 18' 20" E, 20 FEET; THENCE S 62° 06' 42" W, 482.92 FEET TO ROAD R/W; THENCE N 27° 53' 18" W, 560 FEET; THENCE N 62° 06' 42" E, 300 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 377.23 FEET; THENCE S 86° 49' 57" E, 489.51 FEET TO A POINT ON A CURVE;

THENCE NELY ALONG CURVE 812.41 FEET; THENCE NORTH 1000 FEET TO A POINT ON A CURVE; THENCE NWLY ALONG CURVE 306.06 FEET; THENCE N 35° W, 1598.87 FEET TO A POINT ON A CURVE; THENCE WESTERLY ALONG CURVE 578.67 FEET; THENCE S 62° 06' 42" W, 300 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 471.89 FEET; THENCE S 13° 49' 24" W, 400 FEET TO A POINT ON A CURVE; THENCE SLY ALONG CURVE 197.99 FEET; THENCE S 03° 03' 18" E, 247.78 FEET TO A POINT ON A CURVE; THENCE SWLY ALONG CURVE 355.92 FEET; THENCE S 62° 06' 42" W, 200 FEET; THENCE N 27° 53' 18" W, 250 FEET; THENCE S 62° 06' 42" W, 10.31 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 534.98 FEET; THENCE N 13° 49' 24" E, 1219.38 FEET; THENCE S 76° 10' 36" E, 16.98 FEET; THENCE N 13° 49' 24" E, 113.30 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 386.08 FEET; THENCE N 50°12' 21" E, 1271.06 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 818.59 FEET; THENCE N 52° 57' 05" E, 73.87 FEET TO A POINT ON A CURVE; THENCE NELY ALONG CURVE 828.75 FEET; THENCE N 50°12' 21" E, 1174.63 FEET; THENCE SOUTH 4278.03 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT FROM ALL OF THE ABOVE PARCELS, THE FOLLOWING PARCELS OR PROPERTIES:

THOSE PROPERTIES DESCRIBED IN SPECIAL WARRANTY DEEDS RECORDED APRIL 12, 2007 IN OFFICIAL RECORDS BOOK 7247, PAGE 29 AND IN OFFICIAL RECORDS BOOK 7247, PAGE 145, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

THOSE PARCELS CONVEYED TO POLK COUNTY IN OFFICIAL RECORDS BOOK 8065, PAGE 967 AND OFFICIAL RECORDS BOOK 8065, PAGE 971, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

THOSE PARCELS CONVEYED TO CITY CENTER COMMUNITY DEVELOPMENT DISTRICT IN OFFICIAL RECORDS BOOK 7363, PAGE 314 AND OFFICIAL RECORDS BOOK 7813, PAGE 2274, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.

NOTE: PARCELS ONE TO SIX ARE OWNED BY BOARDWALK AND BASEBALL, INC., A DELAWARE CORPORATION, F.K.A. CIRCUS WORLD, INC., A DELAWARE CORPORATION, BY VIRTUE OF WARRANTY DEEDS RECORDED IN OFFICIAL RECORDS BOOK 2421, PAGE 275, OFFICIAL RECORDS BOOK 2241, PAGE 1770, AND QUIT CLAIM DEED, DISCLAIMER AND RELEASE RECORDED IN OFFICIAL RECORDS BOOK 7813, PAGE 2277, ALL OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA

NOTE: PARCEL SEVEN IS OWNED BY COLERIDGE CORPORATION, A DELAWARE CORPORATION, BY VIRTUE OF WARRANTY DEED RECORDED IN OFFICIAL RECORDS BOOK 2528, PAGE 1431, OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA

# EXHIBIT B TO
# AGREEMENT FOR PURCHASE AND SALE AGREEMENT

**To be supplemented**

# EXHIBIT C TO
# AGREEMENT FOR PURCHASE AND SALE AGREEMENT

## To be supplemented

# EXHIBIT D TO
# AGREEMENT FOR PURCHASE AND SALE AGREEMENT

**To be supplemented**

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:                                                    Chapter 11

BOARDWALK AND BASEBALL, INC.,                             Case No. 8:14-bk-317-MGW
COLERIDGE CORPORATION,                                    Case No. 8:14-bk-318-MGW
BOARDWALK LAND DEVELOPMENT, INC.,                         Case No. 8:14-bk-319-MGW

                                                          *Jointly Administered Under*
         Debtors.                                         *Case No. 8:14-bk-317-MGW*
_____/

**NOTICE OF PROPOSED SALE AND OF DEADLINE AND**
**PROCEDURES FOR SUBMISSION OF COMPETING BIDS**

    **NOTICE IS HEREBY GIVEN** that BOARDWALK AND BASEBALL, INC.,
COLERIDGE CORPORATION, AND BOARDWALK LAND DEVELOPMENT, INC.
(collectively, the "**Debtors**"), have sought approval of the United States Bankruptcy
Court for the Middle District of Florida, Tampa Division (the "**Bankruptcy Court**") to
enter into an Agreement for Purchase and Sale of Property (the "**PSA**") with the City
Center Community Development District (the "**District**") at a purchase price equal to a
credit bid in the amount of $25,000,000 (the "**Stalking Horse Bid**"), for the sale of
certain real properties located in Polk County, Florida (the "**Real Property**"), which term
is used to and includes all improvements (the "**Improvements**") owned by Sellers and/or
located upon the Real Property, and such Sellers' interests, if any, in and to (i) all strips
and gores of land lying adjacent to the property, lands underlying any adjacent streets or
roads, easements, privileges, rights-of-way, riparian and other water rights, and other
appurtenances pertaining to or accruing to the benefit of the Real Property; (ii) all fixtures
currently located on the Real Property (the "**Personal Property**"); (iii) all licenses,
permits, contract rights, development rights, entitlements and approvals pertaining to the
ownership operation and/or proposed development of the Real Property, including, but
not limited to, the existing development rights, governmental approvals, density rights,
licenses, contract rights, impact fee credits, permits, licenses, development orders and
building permits, including without limitation any rights with respect to the Development
Order for Circus World, a Development of Regional Impact, DRI 86-1, recorded in
Official Records Book 2505, Page 1630, of the Public Records of Polk County, as
amended from time-to-time, and the terms and conditions of that Development
Agreement for Victor Posner City Center DRI – PHASE 1 recorded May 22, 2006 in
Official Records Book 6787, Page 503, as affected by Restated, Amended & Updated

Development Agreement for Victor Posner City Center DRI – PHASE 1 recorded November 16, 2006 in Official Records Book 7059, Page 1074, and Restated, Amended, Updated Development Agreement for Victor Posner City Center Development of Regional Impact recorded January 27, 2010 in Official Records Book 8063, Page 1200, and Restated, Amended, and Updated Development Agreement for Victor Posner City Center Development of Regional Impact recorded August 13, 2013 in Official Records Book 9032, Page 2036, of the Public Records of Polk County, Florida (collectively, the "**DRI Rights**"); and (iv) all of Sellers' general intangible rights pertaining to ownership and proposed development of the Real Property (all of Sellers' interest in the Real Property, Improvements, the Personal Property and all other property and rights described herein are collectively referred to as the "**Property**"). The Property shall be sold as one lot and shall not be offered in smaller parcels.

On April __, the Debtors, the District, U.S. Bank National Association, solely as indenture trustee, and City Center Bonds, LLC (collectively, the "**Co-Plan Proponents**") filed with the Bankruptcy Court a motion (the "**Sale Motion**") seeking, among other things, the authority of the Bankruptcy Court for the sale (the "**Sale**") of the Property to the District or its designee and to solicit competing bids for the sale of the Property, to schedule an auction, if necessary, and to seek the approval of the sale of the Property free and clear of all liens, claims and encumbrances, except for those specified in the PSA.

This Notice is intended to summarize briefly certain important features of the Sale Motion, the procedures for the solicitation of offers for the proposed sale of the Property pursuant to the terms of the Sale Motion and to notify prospective purchasers and other parties in interest of the filing of the Sale Motion and of the deadline and procedures for the submission of any bids. Prospective purchasers and other parties in interest should not rely solely upon the Notice as it is intended to be a brief summary only, but should instead review the Sale Motion and other relevant documents on file with the Clerk of the Bankruptcy Court.

**NOTICE IS FURTHER GIVEN** that the Sale Motion and the PSA are on file with the Bankruptcy Court and are available for inspection and photocopying during regular business hours at the Office of the Clerk of the United States Bankruptcy Court, Tampa Division, 801 N. Florida Ave., Ste. 555, Tampa, Florida 33602. Any party wishing to receive a copy of the Sale Motion and PSA may obtain such copy, via United States first class mail or by email, upon written request to Edward J. Peterson, III, Esquire, counsel for the Debtors, who may be contacted by mail at Stichter, Riedel, Blain & Prosser, P.A., 110 E. Madison Street, Suite 200, Tampa, Florida 33602, or by email at epeterson@srbp.com.

**NOTICE IS FURTHER GIVEN** that the following procedures (the "**Bid Procedures**") are proposed:

(a) **Qualified Bids**. To constitute a Qualified Bid, each bidder other than the District must deliver to each of the respective counsel for the Co-Plan Proponents and counsel for the Debtors, in trust no later than **5:00 p.m., eastern standard time, on August 4, 2014**: (i) a signed purchase and sale contract, in form and content substantially similar to the PSA, with a redlined copy showing any changes, in an amount sufficient to comply with the Minimum Bid Requirements (defined below), without contingency of any kind; (ii) an earnest money deposit equal to $3,000,000 in cleared funds (a "**Deposit**"); and (iii) written evidence of financial ability to pay, free of any contingency, an amount equal to or in excess of the Minimum Bid Requirement (as defined below) on or before **August 4, 2014 at 5:00 p.m. eastern standard time** (a "**Qualified Bid**"). The Co-Plan Proponents, subject to the Court's approval, shall have the sole discretion, to determine whether a bid is a Qualified Bid (a "**Qualified Bidder**"). The Co-Plan Proponents will notify parties three (3) business days prior to the Auction date whether any bid qualified as a Qualified Bid.

(b) **Minimum Bid Requirements**. Any Qualified Bidder must execute a purchase and sale agreement that is in substantially the same form as the PSA which shall include a cash purchase without contingency and including an initial bid of at least $25,250,000, plus assumption or the payment of real estate taxes and outstanding O&M Assessments as set forth in the PSA and any Cure Costs (as defined in the Sale Motion) required to be paid (the "**Minimum Bid Amount**"). The Minimum Bid Amount represents an amount sufficient to satisfy the following: (i) administrative costs of the Debtors' estates for professional fees and costs, including costs of sale; and (ii) the Cure Costs, if any. Any subsequent Qualified Bids to be made over the Minimum Bid Amount shall be made in increments of at least $250,000 (collectively with the Minimum Bid Amount, the "**Minimum Bid Requirements**"). The Sale Notice shall contain the Minimum Bid Amount and the Minimum Bid Requirements.

(c) **Earnest Money Deposit**. The Deposit required shall be payable by cashier's or certified check, payable to "Arnstein & Lehr LLP as escrow agent" or by wire transfer of immediately available funds on or before **August 4, 2014 at 5:00 p.m. Eastern Standard Time**. The Deposit, together with any interest accrued thereon, will be applied as a credit against the purchase price paid by the Buyer (defined below). At the conclusion of the Sale and upon Court approval of the winning bid, all Deposits made by Qualified Bidders other than the Buyer will be promptly returned (without interest); **provided, however, that a third party Qualified Bidder who makes the second highest and best bid (the "Back-Up Bid") shall remain the back-up bidder (the "Back-Up Bidder") until closing of the Sale. In the event the Back-Up Bid is the Successful Bid, the Sale to the Back-Up Bidder shall close pursuant to the Bid Procedures. In the event of a Back-Up Bidder default, the District shall become the Back-up Bidder and close the Sale by credit bid in an amount equal to its last highest credit bid, but not to exceed the Maximum Credit Bid. In the event the Successful Bidder and/or the Back-Up Bidder is unable to close the Sale, the Successful Bidder and/or Back-Up Bidder's Deposit shall be forfeited and**

3

**distributed 50% to the Debtors and 50% to the Indenture Trustee for the benefit of the Bondholder. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes over any such Deposit.**

(d)   **Ability of the District to Credit Bid**. The Stalking Horse Bid shall be a credit bid. The District shall be entitled to credit bid up to the Maximum Credit Bid without complying with the Minimum Bid Requirements. No other party shall be permitted to credit bid or shall be excused from the Bid Procedures or Minimum Bid Requirements. The Stalking Horse Bid is deemed accepted by the Debtors and Co-Plan Proponents, subject to Bankruptcy Court approval of the Sale Motion. The District shall be deemed a Qualified Bidder and is excused from having to comply with the provisions of subparagraph (a) above and shall be entitled to the protections of 11 U.S.C. § 363(m) if it is the Successful Bidder.

(e)   **Higher and Better Bids**. The Auction shall be conducted on **August 12, 2014 at 10:00 a.m. eastern standard time** at the offices of Stichter Riedel Blain & Prosser, P.A. if, and only if, there is at least one Qualified Bidder who has met the requirements for a Qualified Bidder and been accepted as a Qualified Bidder. At the Auction, Qualified Bidders may submit bids equal to or greater than the Minimum Bid Requirements, in increments of at least $250,000, until the conclusion of the Auction. The entity that submits what the Co-Plan Proponents believe constitutes the highest and best offer shall constitute the "Successful Bidder." The bid of the Successful Bidder (the "**Successful Bid**") shall be presented to the Court for approval on the date and time set by this Court for the final hearing to approve the Sale. If the Court approves the Successful Bid, the Successful Bidder shall become the "**Buyer**" and shall close on the Sale as provided herein. In the event there is no Qualified Bidder other than the District, the Co-Plan Proponents shall seek immediate entry of the Final Sale Order approving the Stalking Horse Bid as the Successful Bid and the District or its designee as the Successful Bidder.

(f)   **Right to Be Heard**. The Debtors and any and all creditors, interest holders, the United States Trustee and other parties in interest, including specifically, but not limited to, the Co-Plan Proponents, may be heard as to any and all issues regarding the Sale; provided, however, that a party that is merely a Qualified Bidder is not such a party in interest.

(g)   **Overbid Fee**. There shall be no Overbid Fee.

(h)   **Bankruptcy Court Approval**. The Sale contemplated herein shall be subject to the entry of a Final Sale Order.

(i)   **Forfeit of Deposit**. If any Buyer fails to close the purchase in accordance with the terms hereof, it will forfeit its Deposit and the Property will be sold

4

to the Back-Up Bidder as described above. The Buyer's forfeited Deposit shall be distributed in accordance with the Sale Motion.

(j) **No Representations**. The Property shall be purchased on an "as is, where is" basis, with no representations or warranties (express or implied) of any kind or nature whatsoever, other than the representations and warranties contained in the PSA when finalized.

(k) **Due Diligence**. Due diligence must be completed in full, without reservation, at least one (1) business day prior to the deadline to submit a Qualified Bid.

(l) **Payment of Purchase Price**. The purchase price for the Real Property as finally approved by the Court at the Sale shall be payable in full at the Closing by wire transfer of immediately available funds; provided, however, that the District shall not be obligated to pay cash up to the Maximum Credit Bid. The Co-Plan Proponents shall pay any amounts owed as costs of Sale, including fees, costs and expenses of the Broker, as further set forth in the Sale Motion. The Buyer shall take title to the Property at Closing subject to outstanding real estate taxes, O&M Assessments, and other items set forth in the PSA.

(m) **Closing**. The Sale and transfer of title to the Successful Bidder shall be consummated at the offices of Stichter Riedel Blain & Prosser, P.A. during normal business hours no later than five (5) business days after the entry of the Final Sale Order (provided that the Confirmation Order has been entered, unless such requirement is waived in writing by the Successful Bidder) (the "**Closing**"). On request of the Successful Bidder, the Debtors may extend the Closing; provided, however, that the Closing shall not be extended beyond September 3, 2014. The proceeds from the Sale (if the District is not the Successful Bidder) shall be disbursed at Closing, as further set forth in the Sale Motion.

Dated: April 9, 2014

/s/ Edward J. Peterson
Harley E. Riedel (FBN 183628)
Edward J. Peterson, III (FBN 0014612)
Stichter Riedel Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida  33602
(813) 229-0144 – Phone
(813) 229-1811 – Fax
hriedel@srbp.com
epeterson@srbp.com
Attorneys for Debtors

# SCHEDULE 1

**BOARDWALK - SETTLEMENT SCENARIOS**

### CREDIT BID SCENARIOS - SEE NOTES AT BOTTOM OF TABLE

| Bid Scenarios | Bondholder Payments | | | |
| --- | --- | --- | --- | --- |
| | Debtor Recovery Excluding Carve-out | Colliers' Fee | Debtor Carve Out | Total Payments Before Carve-out |
| $25,000,000 | $0 | $125,000 | $250,000 | $375,000 |
| REDACTED | | | | |

### THIRD PARTY SALE SCENARIOS - SEE NOTES AT BOTTOM OF TABLE

| Bid Scenarios | Bondholder | | | | Debtors | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Gross Proceeds | Less Share of Colliers' Fee | Less Contribution to Debtor for Carve Out | Net Proceeds | Gross Proceeds | Less Share of Colliers' Fee | Plus Contribution from Bondholder for Carve Out | Net Proceeds |
| $25,000,000 | $25,000,000 | $375,000 | $250,000 | $24,375,000 | $0 | $0 | $250,000 | $250,000 |
| $26,000,000 | $25,500,000 | $195,000 | $125,000 | $25,180,000 | $500,000 | $195,000 | $125,000 | $430,000 |
| $27,000,000 | $26,000,000 | $202,500 | $125,000 | $25,672,500 | $1,000,000 | $202,500 | $125,000 | $922,500 |
| $28,000,000 | $26,500,000 | $210,000 | $125,000 | $26,165,000 | $1,500,000 | $210,000 | $125,000 | $1,415,000 |
| $29,000,000 | $27,000,000 | $217,500 | $125,000 | $26,657,500 | $2,000,000 | $217,500 | $125,000 | $1,907,500 |
| $30,000,000 | $27,500,000 | $220,500 | $50,000 | $27,229,500 | $2,500,000 | $229,500 | $50,000 | $2,320,500 |
| $31,000,000 | $28,000,000 | $223,500 | $50,000 | $27,726,500 | $3,000,000 | $241,500 | $50,000 | $2,808,500 |
| $32,000,000 | $28,500,000 | $226,500 | $50,000 | $28,223,500 | $3,500,000 | $253,500 | $50,000 | $3,296,500 |
| $33,000,000 | $29,000,000 | $229,500 | $50,000 | $28,720,500 | $4,000,000 | $265,500 | $50,000 | $3,784,500 |
| $34,000,000 | $29,500,000 | $232,500 | $50,000 | $29,217,500 | $4,500,000 | $277,500 | $50,000 | $4,272,500 |
| $35,000,000 | $30,000,000 | $235,500 | $50,000 | $29,714,500 | $5,000,000 | $289,500 | $50,000 | $4,760,500 |
| $36,000,000 | $30,000,000 | $235,500 | $0 | $29,764,500 | $6,000,000 | $304,500 | $0 | $5,695,500 |

### NOTES

**GENERAL**

NOTE [1] Stalking Horse: $25 Million Credit Bid

NOTE [2] Carve Out for Unsecured Creditors and Professional fees paid by Bondholder in accordance with the table above

NOTE [3] Bid Increments: $250,000 - If a winning bid is an amount that is not depicted in the above Bid Scenarios (e.g. $29,250,000), then the payments and respective proceeds will be adjusted accordingly on a pro rata basis

**CREDIT BID SCENARIOS**

NOTE [4] Cap on Credit Bid:    REDACTED

NOTE [5] In addition to payments reflected in the table above, Bondholder assumes ad valorem taxes and past due O&M

NOTE [6] In Credit Bid scenarios, the Broker's fee will be one third of 1.5% or 0.5%

NOTE [7] Bondholders pay Broker's fee as per above

**THIRD PARTY SALE SCENARIOS**

NOTE [8] Split of proceeds in excess of Credit Bid: 50/50 up to $35 Million; 100% to Debtors thereafter

NOTE [9] The Broker's fee and reasonable expenses will be shared as follows:

A. If price is less than or equal to $29 Million, then 50/50 (Bondholder/Debtor)

B. If price is greater than $30 Million, but less than or equal to $35 Million, then amount from [9]A. above plus 20/80 (Bondholder/Debtor) on the incremental sales amount

C. If price is greater than $35 Million, then the amounts due per [9] A. & B. above and the Debtor pays 100% on the incremental sales amount

NOTE [10] Purchaser assumes or pays ad valorem taxes and past due O&M.